## MONTELIOUS, Plaintiffs, v. ELSEA, Defendant.

Common Pleas Court, Pickaway County.

No. 22227. Decided June 27. 1959.

Lemuel B. Weldon, Robert H. Huffer, for plaintiffs.
Tom A. Renick, for defendant.

### OPINION

By AMMER, J.

This action is one seeking a permanent injunction against the defendant irrigating his land by diverting the water of Scippo Creek. To the petition the defendant has filed an answer admitting certain facts and a general denial as to all other allegations. The facts as developed at the hearing indicate that the plaintiffs are the owners of 320 acres of farm land in Pickaway Township. Pickaway County, Ohio, and to the northeast of said farm is the farm of the defendant of 80 acres. The defendant is the upper riparian owner and the plaintiffs are the lower riparian owners on Scippo Creek which runs in a southwesterly direction through the lands of the defendant and the plaintiffs. Scippo Creek is underlain with gravel so that the water in the creek will rise and fall quickly depending upon the rainfall. It appears that in 1956 the creek did go dry during extreme dry spells of some two to four weeks, but that the creek has not been dry since that time.

Plaintiffs in their farming operation had in June 1958, some 60 head of livestock consisting of hogs and cattle which were watered from Scippo Creek. At the time of hearing in this case on June 5, 1959, the plaintiffs testified they had 333 head of livestock consisting of 26 head of beef cattle, 26 calves, 26 yearlings, 8 milk cows, 35 ewes and 52 lambs, 20 sows and approximately 140 pigs. Plaintiffs testified that the livestock were dependent upon Scippo Creek for their water but that they do have two wells on the farm which are situated as to be inaccessible and impractical to use for watering the livestock.

It further appears that the defendant raises various crops on his farm including an area of approximately two acres of strawberries. The

defendant further testified that he also watered certain livestock in Scippo Creek. Another witness, Mr. Kelson Bowers, the upper riparian owner from the defendant's land testified relative to the nature of the creek and also the fact that he used the creek to water livestock.

The testimony of one Harry Styers, weatherman of Circleville, was to the effect of rainfall readings in Circleville which is some five miles from the area involved here during a three and a half year period. His testimony was to the effect that the rainfall in May, 1956, was 5.15, May, 1957, 3.43, May, 1958, 3.20 and May, 1959, 3.50.

It appears following the filing of this injunction suit on June 5, 1958, that there was considerable rainfall during the summer months.

The defendant testified that approximately four to five years ago he purchased a portable irrigation pump which he had used in the dry season during the strawberry bearing period to water the two acres of strawberries. He testified that the use of this portable system was during the strawberry bearing period season only which would be for about a two week period. This portable system is connected to 8 to 10 nozzles into an aluminum pipe and the water is then pumped from Scippo Creek to irrigate the strawberries during that time. Defendant's exhibit No. 1 indicates that the portable irrigation pump will produce 80 gallons per minute at 80 pounds pressure or 175 gallons per minute at 40 pounds pressure. The defendant testified that he used the irrigation system during the dry period in 1958 during the bearing season of strawberries but that he has not used it at all in 1959. In view of the information contained in defendant's exhibit No. 1 it appears that at the maximum pressure this unit will pump 10,500 gallons per hour. The defendant testified that he would use the system when necessary during the two week period on an average maximum of 7 hours per day and for a maximum period of 7 days during any one season, thus, there being a maximum amount of water that would be pumped during said two week period of 514,500 gallons. The defendant testified that he did not use the irrigation system in connection with raising of other crops on the farm.

It appears that in May 1958, there was a dry period and the creek was very low. Testimony of Ruth Montelious, plaintiffs' daughter and Evelyn Montelious, one of the plaintiffs is to the effect that they noticed the water going down on May 28, 1958, and at the same time noticed that the defendant was operating his irrigation pump. They further testified that they went over to talk to the defendant about such irrigation to the effect that this would dry up the creek but he indicated to them he felt that he had a right to pump the water for irrigation of the strawberries. They testified that evening they placed stakes at the water line of the creek and within a 24 hour period they again viewed the creek and noticed that it had fallen approximately 6 inches. There was no direct testimony to indicate that this drop of 6 inches was due entirely or considerably by the irrigation of the defendant.

The testimony of plaintiff's witnesses was also to the effect at the time of the irrigation by the defendant that this would roily up the water and make it less desirable for use of watering the livestock. Other

testimony indicated that the water became roily on many occasions when the irrigation pump was not being used and there was testimony to the effect that this irrigation system would not roily up the water. The defendant's testimony was also to the effect that any excess water after the irrigation of the strawberries would go back into the creek as the land in question sloped towards the creek and is underlain with gravel and therefore the water pumped out of the creek would eventually find its way back to the stream.

Mr. Donald Archer, Soil Conservationist for Pickaway County, testified to the effect that on May 21, 1958, the defendant contacted him to determine his rights as to the irrigation question and at that time he proceeded to measure the amount of water that flowed past the defendant's farm. On that date he determined the amount to be 4,050 gallons per minute or 243,000 gallons per hour or 5,832,000 gallons in a 24 hour period or 40,824,000 gallons in a 7 day period. On May 21, 1959, Mr. Archer made the same test again at the same place and found the flow to be 4,275 gallons per minute or 256,500 gallons per hour or 6,156,000 gallons for a 24 hour period or 43,092,000 gallons for a 7 day period. He further testified that the excess water from the land irrigated would flow back into the creek as the ground was underlain within 30 to 36 inches of the surface.

Mr. Archer further testified as to the amount of water that the various livestock would need daily and that the water needed for the 333 head of livestock of the plaintiffs was 1,024 gallons per day for each 24 hour period. He further testified that the pump using 10,500 gallons per hour would pump approximately 73,500 gallons per day of 7 hours pumping and considering the amount of water flowing past this particular place as of May 21, 1959, there would be an excess flow after the use by irrigation to the excess of 6,082,500 gallons per day that would flow on down to the lower riparian owners, the plaintiffs herein. Mr. Archer further testified that the water at the time the irrigation system was operating was clear and not roily. It was his further opinion that the pump being used at its maximum could not be the means of drying up the creek. On cross examination Mr. Archer testified that there may be a 1% difference in grade of the creek at the plaintiff's farm from the defendant's farm but that the effect of that causing the water to flow at a faster pace would be of no consequence.

LAW APPLICABLE TO THE CASE.

The general rule as to irrigation rights of riparian owners is set forth in 30 Am. Jur., p. 856, to the effect "that riparian owner has a right to make a reasonable use of a stream for purpose of irrigation and that such is a propery right and entitled to protection where it exists." In 94 C. J. S. at page 251 it is stated: every riparian owner on a stream has a limited right to use the water to irrigate his riparian lands" in 30 Am. Jur. at page 859 it is further stated: "that so long as a riparian owner takes only his reasonable share of water for irrigation, and uses it upon his land without unreasonable waste, other owners below have no right to inquire how, or by what means, or at what place he manages to divert his share from the stream." At page 860 it is stated:

"that the use of water for irrigation purposes must be reasonable, an upper riparian owner, in using the water of a stream for that purpose, must not waste, needlessly diminish, or wholly consume it, so as to injure other like owners or prevent a reasonable use of it by them also." At page 861 it is stated: "The amount of water which may be used for irrigation ordinarily cannot be ascertained or determined definitely, and no arbitrary or abstract rule can be stated. While what constitutes a reasonable use of the water of a stream for irrigation is a question largely dependent on the facts and circumstances of each case, it is generally held that where the water of a stream does not supply more than sufficient water to answer the natural wants of the different proprietors, which include the use of as much as is necessary for strictly domestic purposes and to furnish drink for man and beast, none of the proprietors is entitled to use the water for irrigation." At page 862 it is stated: "The right of irrigation can be exercised by an upper owner only by returning the water not wanted for that purpose to its accustomed channel at the upper boundary line or above the land of a lower owner."

The general rule applicable herein is set forth in 56 Am. Jur. at page 501 as follows: "It is a general principle of the law of waters, subject to certain exceptions and modifications hereinafter noted, that a riparian proprietor has the right to have the water of the stream flow by or through his premises in its natural mode, course, and volume. This right is not, however, an absolute right to the flow of all the water in its natural state, but is subject to the right of the upper owners to make a reasonable use of such waters, the rights of riparian proprietors in this as in other respects being to a great extent mutual, common, or correlative, or, as stated in some cases, in the nature of a tenancy in common."

In 93 C. J. S. at page 608 the general rule is set forth as follows: "In the absence of any modification of relative rights, at common law every riparian owner is entitled to the natural flow of the water of a running stream through or along his land, in its accustomed channel, undiminished in quantity or impaired in quality. Generally, every riparian owner has the right to make any use of the water, beneficial to himself, on the riparian land; but he must exercise his right in a reasonable manner and to a reasonable extent so as not to interfere unnecessarily with the corresponding rights of others. The use of water by a riparian owner must be reasonable when considered with reference to the needs or rights of other such owners on the same stream. Generally, the riparian owner, may use the water in a reasonable manner and extent to satisfy his natural wants, or for any beneficial purpose."

The general rule is set forth in 41 O. Jur. page 19 as follows: "The right to the use of water in its natural flow is not a mere easement or appurtenance, but is inseparably annexed to the soil itself. It therefore follows and is a well settled rule of law that a riparian owner is privileged and has the right to make use of the waters of the stream for any necessary and proper purpose incident to the land itself and essential to its enjoyment. However, he must so use it as not to injure an adjoining proprietor, either above or below him. It is well settled

that the right of the riparian owner to the use of the waters of a stream is a qualified and not an absolute, right of property, and that as between different riparian owners, each one is limited to a reasonable use of such waters, with due regard to the rights and necessities of all others interested. The question seems to be rather as to the reasonableness of the use under all the circumstances of the case. It has been held, however, that the limit of the upper proprietor's right in the reasonable use of the stream on his own land is that he shall not injure the lower proprietor. The right of the riparian proprietor to the natural flow of the stream through his premises is subject to qualification, since streams of water are intended for the use and comfort of man, and it would be unreasonable, and contrary to the universal consent of mankind, to debar riparian proprietors from the application of the water to domestic, agricultural, and manufacturing purposes, in a proper manner, even though such qualification does, to some extent, interfere with the natural flow of the water. The use of streams of water for domestic, agricultural, and manufacturing purposes is, to some extent, publici juris. The primary use of water in a stream is for domestic purposes. Since the amount of water which an individual living on the banks of a stream will use for domestic purposes is comparatively trifling, such use may be tolerated upon the principle of de minimis non curat lex."

In **41 O. Jur., page 23,** it is stated: "as to what is a reasonable use, is a question of degree and is dependent upon the facts in each particular case." That the watering of livestock is a domestic use see Rancho Santa Margrita v. Vail, 81 Pac. (2d), 533.

The Ohio rule is clearly set forth in the case of **City of Canton v. Shock et al, 66 Oh St 19,** the fourth and fifth syllabus reads as follows: "Where there are upper and lower proprietors upon a natural running stream, both having manufactories propelled by the water of the stream, and the water is insufficient to fully supply the needs of both, each one has a right to the reasonable use of the water, considering all the circumstances. In such cases the water of the stream should be so divided and used that each proprietor shall bear his fair proportion of the loss caused by the shortage of water, considering all the circumstances of the case." The court in that case stated that "this being so, the city of Canton, in supplying water to its inhabitants for power purposes, had the right to use the water of the stream to a reasonable extent only, and so as to do as little injury as might be, under all the circumstances, to the lower proprietor, each party bearing an equitable share of the loss caused by the shortage of water. Dry seasons are not caused by either party, but are the act of God, and each party must bear the losses resulting to him therefrom. From the earliest dawn of history to the present time, the primary use of water has been for domestic purposes, and its secondary use for the purposes of power. People on the upper streams have the right to quench their thirst, and the thirst of their flocks and herds, even though by so doing the wheels of every mill on the lower stream should stand still. And the same right in the use of water as to quenching thirst, extends to all uses for domestic purposes; and the rights of a lower proprietor to the use of the waters of

a stream for power purposes, is subject to the superior right of all upper proprietors for domestic purposes, and must yield thereto. All water powers on a stream are established subject to the superior right of all upper proprietors to use water out of the stream for domestic purposes, and if the upper proprietors have grown so large, or become so numerous as to consume most, or all of the water, the lower proprietors have no cause of complaint, because it is only what they should have reasonably expected in the growth and development of the country, and subject to which contingency they established their water powers." The court in that case further stated, that: "the general rule is well stated by Paxson, J., in Pennsylvania Rd. Co. v. Miller, 112 Pa. St., 34, 41, as follows: "The principle established by a long line of decisions is that the upper riparian owner has the right to the use of the stream on his land for any legal purpose, provided he returns it to its channel uncorrupted and without any essential diminution; that in all such cases the size and capacity of the stream is to be considered, and that any interruption of, or interference with, the rights of the lower riparian owner is an injury for which an action will lie, unless too trifling for the law to notice." The same general principle was stated in the case of **Akron Canal and Hydraulic Co. v. Fontaine, 72 Oh Ap 93** at 99, the court stated the following: "It is ancient learning that the right to flowing water is incident to the title to land and that there is no right of property in such water in the sense that it is the subject of exclusive appropriation and dominion. The property interest is usufructuary. And each riparian owner has the right to have the natural flow of the stream come to his land and to make a reasonable use thereof, however subject to a like right of each upper proprietor, and further to an obligation to lower proprietors to permit the water to pass on from his estate unaffected except by such consequences as follow from a reasonable and just use of the water."

From a review of the authorities and the facts herein the question before the Court is whether or not the defendant by using the irrigation pump for a two week period during the strawberry bearing season made a reasonable or unreasonable use of the water flowing by his land as a riparian owner. The Court feels that the testimony herein does not establish that the defendant's operation during this two week period when necessary would be such as to cause the creek to dry up. On other occasions and of significance is the fact that during the dry spell in May 1958, when the irrigation pump was used that the creek did not dry up at that time. The nature of the creek is such that it goes up and down quite rapidly and this being caused by many natural reasons and it further appears that the effect of the water becoming roily was due to many factors other than irrigation, principally the watering of livestock by several farmers up stream.

The fact that this was a reasonable use is clearly shown by the testimony of Mr. Donald Archer to the effect that some six million gallons flow past the defendant's land daily according to his measurement of the volume of water whereas the irrigation system according to undisputed evidence would use at the most during the 7 hour period which is the maximum used during any one day of 70,000 gallons. These

figures viewed with the fact that plaintiffs' livestock needed according to undisputed evidence approximately only 1,024 gallons per day it is therefore the opinion of the Court that the use by the irrigation pump by the defendant was a reasonable use and was not such as to deprive the plaintiffs of the water needed for their livestock.

It will therefore be the order of the Court that the request for a permanent injunction be denied, that the temporary restraining order be dissolved and that final judgment be entered for the defendant with costs to be assessed to the plaintiffs. A journal entry consistent with the above ruling will be prepared saving exceptions to the plaintiffs.