APPEL, Justice
(concurring in part and dissenting in part).
I cannot join the majority opinion. Nonetheless, for the reasons expressed below, I concur impart and dissent in part.
I. Introduction.
A. What Is Presented: Significant Issues—Ghosts and Goblins. This case touches upon some difficult and profound issues in our law. These issues include the nature of riparian water rights, the proper approach, if any, to controlling pollution of rivers and streams as a result of common agricultural practices, and the ability of a government subdivision to assert claims based on allegations of water pollution against another governmental subdivision.
For purposes of this case I, like the majority, assume the facts that have been provided to us by the federal district court in this certified question matter. Under the district court’s certification order, we are to assume that the defendant drainage districts are collecting agricultural runoff that is then discharged into the Raccoon River and that the runoff is so polluted with nitrates that the water withdrawn by the Des Moines Water Works' (DMWW) does not meet the health and safety standards of the Safe Drinking Water Act as amended. See 42 U.S.C. § 300g-l (2012). As a result of the noncompliance, the DMWW expends significant funds to remove the nitrates from the water before the water is sold to its customers. DMWW seeks to *74 recover damages for past cleanup efforts and an injunction to prevent the defendants from continuing to pollute the Raccoon River in the future.
To consider the issues, I first explore the contours of our law related to drainage districts. Taking the facts provided by the federal district court as true, I then consider whether money damages are available under our caselaw and applicable statutes. I then consider whether any alleged limitation in the power of drainage districts to pay money damages gives rise to a state constitutional claim rooted in the due process, equal protection, or inalienable rights clauses of the Iowa Constitution. I thereafter explore the law or remedies as well as the substance of the law of nuisance.
Finally, I consider whether DMWW may bring a takings claim against the defendants because of its alleged pollution of the Raccoon River. I consider whether property interests are involved,. whether the property interests are “private” for the purposes of takings law, and whether DMWW has standing to bring a takings claim against the drainage district defendants.
B. What Is Not Presented: False Trails. Before launching into the substantive analysis, it is important to emphasize what this case is not about. It raises no question about who owns the water—all agree that the state owns the water. See Iowa Code § 455B.171(39) (2015). It raises no question of navigation rights. See Gibson v. United States, 166 U.S. 269, 271-72, 17 S.Ct. 578, 579, 41 L.Ed. 996, 1000 (1897). It raises no question of allocation of limited quantities of water. See City of Trenton v. New Jersey, 262 U.S. 182, 185, 43 S.Ct. 534, 536, 67 L.Ed. 937, 940 (1923). It raises no question of flooding related to the operation of drainage districts. See Sanguinetti v. United States, 264 U.S. 146, 150, 44 S.Ct. 264, 265, 68 L.Ed. 608, 610-11 (1924).
All the legal questions raised in this case revolve around the allegation made by the DMWW that the drainage district defendants have conducted drainage district operations in a way that has caused unlawful pollution of the waters of the Raccoon River which DMWW uses for purposes of providing water to its customers. In short, this is a pollution case.
II. Setting the Table: Overview of Drainage District and Nuisance Law.
A. Introduction. Before diving into the issues, it is important to have a bird’s-eye overview of the relevant law. I begin by surveying the constitutional environment as the starting point for consideration of the issues raised in this case. I next turn to the statutory environment, including not only the statutory framework for drainage districts but the statutory provisions related to nuisance and water pollution. These statutory provisions are important because the interrelationship between environmental law and drainage district law is at the heart of this case. Finally, I briefly review the common law of nuisance, which is not preempted by either statutory nuisance or any other environmental statute.
B. Constitutional Environment.
1. Article I, section 18: Authorization of drainage districts. Drainage districts are authorized by the eminent domain article of the Iowa Constitution. This constitutional provision authorizes the general assembly to
pass laws permitting the owners of lands to construct drains, ditches, and levees for agricultural ... purposes across the lands of others, and provide for the organization of drainage districts, vest the proper authorities with power to con *75 struct and maintain levees, drains and ditches and to keep in repair all drains, ditches, and levees heretofore constructed under the laws of the state, by special assessments upon the property benefited thereby.
Iowa Const, art. I, § 18.
Further, article I, section 18 provides for condemnation powers for drainage districts: “The general assembly may provide by law for the condemnation of such real estate as shall be necessary for the construction and maintenance of such drains, ditches and levees, and prescribe the method of making such condemnation.” Id.
2. Article III, section S9A: County home rule. In 1978, the Iowa Constitution was amended to provide for county home rule. Specifically, article III, section 89A provides,
Counties or joint county-municipal corporation governments are granted home rule power and authority, not inconsistent with the laws of the general assembly, to determine their local affairs and government, except that they shall not have power to levy any tax unless expressly authorized by the general assembly. ...
[[Image here]]
The proposition or rule of law that a county or joint county-municipal corporation government possesses and can exercise only those powers granted in express words is not a part of the law of this state.
Iowa Const, art. Ill, § 39A. This constitutional provision is important because it has potential application to a key issue in this case, namely, the scope of power of drainage districts.
C. Iowa Statutory Environment.
1. Iowa Code chapter ⅛68: The drainage district framework. An elaborate and detailed statutory framework for drainage districts is codified in Iowa Code chapter 468. Under chapter 468, the board of supervisors of a county is authorized to create a drainage district and “cause to be constructed” within the drainage district “any levee, ditch, drain, or watercourse, or settling basins” and “to straighten, widen, deepen, or change any natural watercourse” whenever such action will be “of public utility or conducive to the public health, convenience or welfare.” Iowa Code § 468.1.
Iowa Code section 468.2 further provides that the drainage of surface waters from agricultural lands and other lands or the protection of lands from overflow is “presumed to be a public benefit and conducive to the public health, convenience, and welfare.” The legislature has directed that the provisions of laws related to drainage and protection from overflow “shall be liberally construed to promote leveeing, ditching, draining, and reclamation of wet, swampy, and overflow lands.” Id. § 468.2(2).
The statute provides for the appointment of commissioners to apportion and assess the costs and expenses of constructing proposed improvements. Id. § 468.38. When the board of supervisors has finally determined the matter of assessments of benefits and apportionment for drainage district improvements, the board is given the power to levy the assessments as fixed by it upon lands within the district. Id. § 468.50. The law provides that such taxes “shall be paid out only for purposes properly connected with and growing out of the county drainage and levee districts on order of the board.” Id. § 468.54.
After a drainage district has been created and improvements constructed, the statute authorizes repairs and additional improvements. With respect to repairs, the board is authorized
*76 to restore or maintain a drainage or levee improvement in its original efficiency or capacity, ... repair any dam? aged structures, remove weeds and other vegetable growth, and whatever else may be needed to restore or maintain such efficiency or capacity or to prolong its useful life.
Id. § 468.126(l)(a).
The board is also authorized to construct improvements. Id. § 468.126(4). The term “improvement” is defined as “a project intended to expand, enlarge, or otherwise increase the capacity of any existing ditch, drain, or other facility above that for which it was designed.” Id. Costs of improvements are to be paid out of drainage district funds or, if funds are not sufficient, from assessments on land. Id. §§ 468.127, .147. The assessments must be made at one time, but may be collected in installments. Id. § 468.127. In cases when current funds are insufficient and the improvement cannot be funded by a single year’s levy, the board may issue drainage bonds to finance the improvements. Id. § 468.74.
Chapter 468 does not contain a provision that addresses potential pollution arising from the operation of drainage districts. There is a provision in current law related to nuisance from overflow:
Any ditch, drain, or watercourse which is now or hereafter may be constructed so as to prevent the surface and overflow water from the adjacent lands from entering and draining into and through the same is hereby declared a nuisance and may be abated as such.
Id. § 468.150.
Notably, there are no provisions in chapter 468 specifically declaring that money damages may not be paid by a drainage district. Further, there are no provisions expressly stating that generally applicable nuisance law does not apply against a drainage district. Indeed, there are no provisions of Iowa Code chapter 468 expressly exempting drainage districts from provisions of law germane to this case.
2. Iowa Code chapters I55A and B. Iowa Code chapters 455A and B provide the framework for the Iowa Department of Natural Resources. The purpose for creating the department is to protect “Iowa’s air, soils, waters, and rich diversity of life” because “[t]he well-being and future of Iowa depend on these natural resources.” Id. § 455A.15. The general assembly found “[tjhere has been a significant deterioration in the quality of Iowa’s surface waters and groundwaters” because of human activity. Id.; see also id. § 455B.262 (describing the importance to the state of protecting “life and property from floods” and “the orderly development, wise use, protection, and conservation of the water resources of the state”).
In order to accomplish this goal, the department “has the primary responsibility for ... managing fish, wildlife, and land and water resources in this state.” Id. § 455A.2; see also id. § 455A.16 (describing the policy of the state of Iowa to protect Iowa’s waters, among other natural resources, for the benefit of present and future citizens). The director of the department is required to cooperate with the Department of Agriculture and Land Stewardship in the “administration of programs relating to water quality improvement and watershed improvements.” Id. § 455A.4(l)(j). The Environmental Protection Commission, created by Iowa Code section 455A.6, is required to protect Iowa’s groundwater and water supply and is directed to cooperate with “cities and other subdivisions of the state” as well as landowners in actions “relating to flood control and the use of water resources.” Id. § 455B.263(7).
*77 3. Iowa Code chapter 657: Statutory nuisance, Iowa Code section 657.1 provides for a statutory nuisance civil action. Among other things, this section states,
Whatever is injurious to health, indecent, or unreasonably offensive to the senses, or an obstruction to the free use of property ... is a nuisance, and a civil action by ordinary proceedings may be brought to enjoin and abate the nuisance and to recover damages sustained on account of the nuisance.
Id. § 657.1. Iowa Code section 657.2 then lists a number of actions or situations that are nuisances under the chapter. In particular, a nuisance includes “[t]he corrupting or rendering unwholesome or impure the water of any river, stream, or pond, or unlawfully diverting the same from its natural course or state, to the injury or prejudice of others.” Id. § 657.2(4).
Iowa Code section 657.3 provides criminal penalties related to nuisances:
Whoever is convicted of erecting, causing, or continuing a public or common nuisance as provided in this chapter, or at common law ..., where no other punishment therefor is specially provided, shall be guilty of an aggravated misdemeanor and the court may order such nuisance abated, and issue a warrant....
Finally, chapter 657 provides for a process including the issuance of warrants to cause abatement of nuisances and describes how the costs of abating a nuisance may be collected. Id. §§ 657.6-.7.
Chapter 657 provides a safe harbor for animal agricultural producers who manage their operations in accordance with state or federal law. Id. § 657.11(1). Aside from the exception for animal agricultural producers, there is no other agriculturally related exemption from nuisance law in Iowa Code chapter 657. In Gacke v. Pork Xtra, L.L.C., however, we held that this exception was unconstitutional as a per se taking without just compensation. 684 N.W.2d 168,185 (Iowa 2004).
D. Iowa Common Law Environment. We have held that statutory nuisance does not preempt a common law nuisance action. Freeman v. Grain Processing Corp., 848 N.W.2d 58, 70 (Iowa 2014); Guzman v. Des Moines Hotel Partners, Ltd. P’ship, 489 N.W.2d 7, 10 (1992). Thus, in addition to the statutory nuisance described in Iowa Code chapter 657, a common law claim remains available to persons alleging environmental harms. The elements of common law nuisance are- “(1) unlawful or anti-social conduct that (2) in some way injures (3) a substantial number of people” for public nuisance and “an actionable interference with a person’s interest in the private use and enjoyment of his land” for private nuisance. Pottawattamie County v. Iowa Dep’t of Envtl. Quality, 272 N.W.2d 448, 453 (Iowa 1978) (second quote quoting Patz v. Farmegg Prods., Inc., 196 N.W.2d 557, 560 (Iowa 1972)); accord State, ex rel. Turner v. Yownker Bros. Inc., 210 N.W.2d 550, 564 (Iowa 1973). We have held that pollution may constitute a public or private nuisance under the common law. See, e.g., Kasparek v. Johnson Cty. Bd. of Health, 288 N.W.2d 511, 520 (Iowa 1980); Pottawattamie County, 272 N.W.2d at 453; Kriener v. Turkey Valley Cmty. Sch. Dist., 212 N.W.2d 526, 531-32 (Iowa 1973); Bader v. Iowa Metro. Sewer Co., 178 N.W.2d 305, 307 (Iowa 1970).
III. More Table Setting: Iowa Case-law Involving Drainage Districts and Environmental Regulation.
A. Introduction. I now turn to the case-law related to drainage districts. First, I examine the opinions on the nature of drainage districts and their powers. I then explore the cases regarding the legal duties of drainage districts that arise both *78 within Iowa Code chapter 468 and from external sources. Finally, I consider the caselaw applying the law of nuisance to agricultural concerns.
B. The Rise (and Fall) of “No Legal Entity” Theory. The older notion that a drainage district is a nonjuristic entity is reflected in Clary v. Woodbury County, 135 Iowa 488, 113 N.W. 330 (1907). In that case, we declared
[a drainage district] is not a person or a corporation. It is nothing more than a definite body or district of land constituting an improvement district. That it has no legal entity is manifest from various sections [of the Code] which place the entire matter under the control and supervision of the board of supervisors.
Id. at 492, 113 N.W. at 332; see also Gish v. Castner-Williams & Ashland Drainage Dist., 136 Iowa 155, 157, 113 N.W. 757, 757 (1907) (noting that a drainage district “is not such [a] legal entity as is known to or recognized by law as a proper party to adversary proceedings”).
The “no legal entity” doctrine at first seemed to stick. In Board of Supervisors v. District Court, we characterized a drainage district as merely “a segregated area of land, which has been set out by legal proceedings, and is subject to assessment for the construction of certain drainage improvements.” 209 Iowa 1030, 1033, 229 N.W. 711, 712 (1930). Thus, a drainage district was simply a tract of land with metes and bounds that might be subject to improvement. It was acres of real estate, nothing more. You cannot sue the back forty.
Over time, however, the no-legal-entity theory began to fall apart. For instance, in Wise v. Board of Supervisors, we considered a case in which the ditch of a drainage district was in poor repair such that it was not operating properly. 242 Iowa 870, 872, 48 N.W.2d 247, 248 (1951). The plaintiffs, owners of farmland in the district, petitioned the board of supervisors to repair the ditch. Id. at 871, 48 N.W.2d at 248. The board abandoned the repair project, however, when other landowners objected to the expense. Id. at 872, 48 N.W.2d at 248.
In Wise, we held, however, that it was clear the “repairs are necessary to make the drainage improvement function properly.” Id. at 874, 48 N.W.2d at 249. We granted mandamus to order the board to make the necessary improvements. Id. at 875, 48 N.W.2d at 249. We left the manner in which to proceed within the sound discretion of the board. Id. Wise plainly stands for the proposition that there is at least one equitable remedy available to require drainage districts to perform a duty, namely, mandamus.
We drifted still further away from the no-legal-entity doctrine in Wapello County v. Ward, 257 Iowa 1231, 136 N.W.2d 249 (1965). In Wapello County, we considered a dispute over county zoning. Id. at 1232, 136 N.W.2d at 249. In passing, we noted that various bodies, including drainage districts, have long been known to the law but defined “only in regard to certain specific purposes.” Id. at 1235, 136 N.W.2d at 251. We characterized these various bodies as “quasi municipal corporations.” Id. The discussion, however, was dictum.
But the Wapello County dictum was followed by a concrete holding in State ex rel. Iowa Employment Security Commission v. Des Moines County, 260 Iowa 341, 149 N.W.2d 288 (1967). In that case, we considered whether a drainage district could be considered a “juristic entity” for purposes of retirement benefits under Iowa Code chapter 97C. Id. at 345, 149 N.W.2d at 290. We concluded that drainage districts were a juristic entity because a drainage district was a “legally recognizable or identifiable *79 political body, unit, organization, or instrumentality of the state or any one or more of its political subdivisions.” Id. at 345-46, 149 N.W.2d at 290-91. We said, “[A]n organized drainage district is a political subdivision of the county in which it is located, its purpose being to aid in the governmental functions of the county. It is a legally identifiable political instrumentality.” Id. at 346, 149 N.W.2d at 291.
As a result, the district court’s holding that it lacked subject matter jurisdiction was overruled. Id. at 347, 149 N.W.2d at 291. Iowa Employment Security demonstrates how far our cases have travelled from the no-legal-entity doctrine of the earlier cases. See Gish, 136 Iowa at 157, 113 N.W. at 757; Clary, 135 Iowa at 492, 113 N.W. at 332. Drainage districts were now being recognized for what they obviously were: a political subdivision of the county in which they were located. See Iowa Emp’t Sec. Comm’n, 260 Iowa at 346, 149 N.W.2d at 291.
We declined to invoke the notion that a drainage district was not an entity in Voogd v. Joint Drainage District No. 3-11, 188 N.W.2d 387, 393 (Iowa 1971). In Voogd, plaintiff landowners sought to recover payments of past drainage assessments and to enjoin the counties’ collection of future assessments to pay for repairs. Id. at 388. The problem in the case was that the counties originally approved the repair based on low-ball estimates. Id. at 389. When costs skyrocketed, the counties continued the repair project. Id. Plaintiffs cried foul. Id. at 390.
We agreed with the plaintiffs and held that future installments could not be collected. Id. at 395. In addition, we ordered a refund of some of the amount that the plaintiffs had already paid. Id. In Voogd, we saw no problem in a drainage district being ordered to repay the amount of funds previously collected.
Fourteen years later, in Fisher v. Dallas County,-we considered a case in which the plaintiff claimed to have experienced flooding problems because of the operation of a drainage district. 369 N.W.2d 426, 427 (Iowa 1985). The plaintiffs in Fisher did not contest our prior holdings. Id. at 429-30. We repeated the familiar refrain that drainage districts only had those powers expressly conferred by the legislature. Id. at 429. On the question of money damages, we offered the qualified observation that drainage districts had no corporate existence “for that purpose.” Id. In Fisher, we characterized the unavailability of money damages as “immunity from suit in tort.” Id. at 430.
Yet, Fisher cited Wise and Voogd with apparent approval. Id. at 429. Fisher did so, in part, by linking the relief afforded in each case to a statutory provision. Id. We stated that the mandamus afforded in Wise was based upon a duty to maintain a drainage district imposed by Iowa Code section 455.135(1). Id. We stated that action in Voogd challenging the validity of assessments was based on the power to levy assessments in Iowa Code section 455.45. Id,
The fighting issue in Fisher was whether the enactment of the Municipal Tort Claims Act, Iowa Code chapter 613A (now chapter 670), overruled our prior cases on the immunity of drainage districts from suits in tort. Id. Under the Act, “municipalities” were subject to liability in tort with certain exceptions. Id. at 430. In Fisher, we held that a drainage district was not a municipality. Id. We reasoned that a drainage district’s immunity from suits in tort did not rise or fall with the doctrine of sovereign immunity. Id. at 430. We retreated to old formulations, including the dubious suggestion that a drainage district was “merely an area of land.” Id. We did not cite Iowa Employment Securi *80 ty, which declared drainage districts were “a political subdivision of the county in which it is located” and “a legally identifiable political instrumentality,” 260 Iowa at 346, 149 N.W,2d at 291, nor did we'cite Voogd, which declared that drainage .districts were “political subdivisions of counties,” 188 N.W.2d at 393. •
Justice Larson dissented, Fisher, 369 N.W.2d at 431 (Larson, J., dissenting). He concluded that a drainage district was a “unit of local government” under the Municipal Tort Claims Act and, as a result, was amenable to tort law suits. Id. Air though the dissent is cryptic, it is apparent that Justice Larson was not buying the ,no-Iegal-entity argument. His dissent was more consistent with Wapello County, Iowa Employment Security, and Voogd than the approach of the majority.'
The next case of interest is Gard v. Little Sioux Intercounty Drainage District, 521 N.W.2d 696 (Iowa 1994). In Gard, we rejected a claim for money damages by the estate of drowned boaters. Id. at 697, 699. We cited Fisher for the proposition that drainage districts have limited powers. Id. at 698. We emphasized the narrow proposition that “Iowa has never allowed tort claims for money damages ‘to be made against a drainage district.”' ‘Id. (emphasis added). The focus in Gard was not on a no-legal-entity theory, but on the limited statutory power of drainage dis-; tricts.
Finally, we considered a claim against ⅛ drainage district in Chicago Central & Pacific Railroad v. Calhoun County Board of Supervisors, 816 N.W.2d 367 (Iowa 2012). A railroad sought to recover monies voluntarily spent on repairs of a drainage district improvement. Id. at 368. The railroad in this case faced a conundrum. See id. Because of problems with a drainage ditch, it could not operate its railroad. Id. Yet, it would take some time to get the drainage district to move on the problem. Id. The railroad decided that instead of waiting for the drainage district to resolve the problem, which could take considerable time, the railroad voluntarily performed the repair to .get its operations up and running as soon as possible. Id, at 369. It then sued the drainage district, seeking to recover the cost of the repair. Id. We declared that while the railroad could have filed a mandamus action to force the railroad to make the repair, it could not, under our caselaw, seek money damages. Id. at 378. Chicago Central did not mention the no-legal-entity theory.
C. The Overflow Cases: Avoiding Statutory Suicide. Now I turn to what might be called “the overflow cases.” The classic overflow case arises when downstream landowners complain when upland drainage districts, by removing water and directing it into rivers and streams, cause flooding downstream.
The seminal overflow case is Maben v. Olson, 187 Iowa 1060, 175 N.W. 512 (1919). In Maben, we considered whether a downstream landowner could obtain an injunction against a drainage district where the activities of the drainage district caused overflow downstream. Id. at 1063, 175 N.W. at 513. In Maben, we characterized the controlling question as,
Is it unauthorized and unlawful to establish a drainage district if so doing will cause water to come into the natural outlet for the district more rapidly and in greater quantity than if the land in the district were left to send its surface water into said outlet without interference by a drainage system, and if it further appears that the increase in rapidity and volume may overtax the natural outlet and cause. a damaging overflow to lands below the entrance to such outlet.

Id.

In Maben, we held that the Iowa Constitution expressly authoi-ized the legislature *81 to give the board of supervisors the power to do precisely what we had described. Id. at 1063-64, 175 N.W. at 513-14. The specific question was further characterized as whether the delegation of power to establish drainage systems “may be interfered with by a court of equity because, through its exercise, a more rapid and a greater flow will reach a natural outlet, to the possible or even probable injury of the lower owners.” Id. at 1065, 175 N.W. at 514. But, as we pointed out, the “cardinal purpose” of draining agricultural lands is acceleration and increased overflow. Id.
In short, the result urged by the Maben plaintiff would ensure that the power given to the drainage districts could not “be used to accomplish the only purpose for which it [was] given.” Id. In other words, the legislature could not have intended overflow to be a nuisance because if it did drainage districts simply could not function. Id. Application of generally applicable nuisance law was thus flatly inconsistent with the specific purpose of drainage districts.
It is hard to argue against the reasoning in Maben. Indeed, prior to the enactment of article I, section 18, the biggest obstacle to draining farmland was securing the right to drain water onto the land of another. See Joseph W. Otto, Subject to Overflow: The History of Drainage Districts in Jasper County, Iowa 25 (Aug. 2012) (unpublished M.A. dissertation, Appalachian State University), https://libres.uncg.edu/ ir/asu/flOtto,%Joseph_2012_Thesis.pdf. Article I, section 18 and the implementing statutes were designed to -eliminate the problem—that is why Maben is clearly correct.
But it is important to note the narrowness of the reasoning and its holding. Clearly, Maben had nothing to do -with a claim arising from alleged pollution. And, in fact, the Maben court went to great lengths to distinguish cases involving pollution of waterways by government entities, thereby demonstrating the narrowness of its holding. 187 Iowa at 1068-70, 175 N.W. at 515-16; see, e.g., City of Atlanta v. Warnock, 91 Ga. 210, 18 S.E. 135, 135. (1892) (holding that if municipality goes beyond authority and injures private property by the opening of manholes and releasing poisonous gases, it is responsible for resulting damage); Gage v. City of Chicago, 191 Ill. 210, 60 N.E. 896, 897 (1901) (holding that an ordinance which resulted in preventing the connection of sewer systems was void because the city had “no right to empty the sewage upon private property”); State v. Concordia, 78 Kan. 250, 96 P. 487, 489-90 (1908) (holding a city could be liable for polluting a river and damaging private landowners, even though a statute authorized the city to dump sewage into the river); Thompson v. City of Winona, 96 Miss. 591, 51 So. 129, 129 (1910) (holding a city liable for damages when it constructed a sewer system which polluted a waterway and damaged the plaintiff); Smith v. City of Sedalia, 152 Mo. 283, 53 S.W. 907, 912 (1899) (holding a city could be liable for polluting a stream flowing into plaintiffs farm, despite city establishing sewer system under legislative mandate); Markwardt v. City of Guthrie, 18 Okla. 32, 90 P. 26, 28-29 (1907) (holding that a lower property owner has a cause of action, including injunctive relief, against a city for polluting a stream); Pearce v. Gibson County, 107 Tenn. 224, 64 S.W. 33, 36 (1901) (issuing an injunction prohibiting a municipality from emptying sewage from a courthouse upon the land of the complainant).
The pollution cases distinguished in Ma-ben were consistent with contemporary Iowa law. In Vogt v. City of Grinnell, we considered an action brought against, a city for discharging sewage into the stream to the material injury of lower riparian own *82 ers. 138 Iowa 363, 364, 110 N.W. 603, 603 (1907). We noted that a statute authorized the city to construct a system of sewers but did not authorize emptying the sewers into a running stream even if the system was functioning as designed. Id. at 365, 110 N.W. at 603. The sewer system was operating perfectly in Vogt, but the unauthorized discharge of sewage to the material injury of riparian proprietors was a wrongful act. Id.; see also Boyd v. City of Oskaloosa, 179 Iowa 387, 390, 161 N.W. 491, 492 (1917).
We considered a later overflow case in Miller v. Monona County, 229 Iowa 165, 294 N.W. 308 (1940). In Monona County, the plaintiff sought a mandatory injunction to abate nuisances caused by water overflow as a result of dust storms and vegetation filling the ditches of the drainage district. Id. at 168, 294 N.W. at 310. In Monona County we stated, “The drainage district is a special creation of the legislature and it requires no argument to sustain the proposition that it cannot create a nuisance while operating within the ambit of power constitutionally delegated.” Id. at 169, 294 N.W. at 311.
Whenever a court says that no argument is necessary to sustain a proposition, we should be especially alert for potential error. Like Maben, Monona County, however, was not a pollution case. It was another overflow case. The Monona County court had no interest in thrusting overflow liability onto drainage districts, even if the overflow was a result of a failure to repair drainage districts. See id.
D. Compliance with Internal Duties Arising from Iowa Code Chapter 468. There are a number of cases where plaintiffs have sought to require drainage districts to comply with statutory duties arising from Iowa Code chapter 468. For instance, as described earlier, we heard a case where plaintiffs sought to require the board of supervisors to repair a drainage ditch, which was obstructed and in poor repair. Wise, 242 Iowa at 871-72, 48 N.W.2d at 248. Originally, the board began the project, but abandoned it when other landowners in the district objected to the expense. Id. at 872, 48 N.W.2d at 248.
In Wise, we held that it was clear under the record that “repairs are necessary to make the drainage improvement function properly.” Id. at 874, 48 N.W.2d at 249. We granted mandamus to order the board to make the improvements. Id. at 875, 48 N.W.2d at 249. Mandamus is an appropriate remedy to compel drainage districts to perform a legal duty under Wise. Additionally, in Voogd, we granted an injunction against a drainage district to prevent the collection of future assessments to pay for a drainage district improvement. 188 N.W.2d at 395.
The availability of mandamus to require a drainage district to perform needed repairs was also discussed in Chicago Central, which was described above. 816 N.W.2d at 373-74. We held that money damages were not available, but we declared that the railroad could have filed a mandamus action to compel the district to make the repair. Id. at 378.
E. Compliance with External Statutory Duties Arising Outside Chapter 468: Defeat of the Impenetrable Legal Bubble Theory. We have, on occasion, considered the interplay between Iowa Code chapter 468 and other statutes. The cases demonstrate that drainage districts are not hermetically sealed in an impenetrable legal bubble from other requirements of the Code.
In Iowa Employment Security, the Iowa Employment Security Pommission assessed and levied taxes and interest claimed due from a drainage district under *83 Iowa Code chapters 97B and 97C. 260 Iowa at 342, 149 N.W.2d at 289. There was no statutory provision in Iowa Code chapter 468 authorizing the drainage district to pay these taxes. Id. at 343-44, 149 N.W.2d at 289-90. The Iowa Employment Security Commission, however, sought to compel the drainage district to “perform asserted statutory duties.” Id. at 346, 149 N.W.2d at 291. We agreed with the commission and held that the provisions of Iowa Code chapter 97B and 97C could be enforced and that mandamus against the drainage district was “the proper remedy.” Id. Thus, equitable remedies are available to enforce against drainage districts duties that arise from statutory provisions outside Iowa Code chapter 468.
There is one other case of interest. In Polk County Drainage District Four v. Iowa Natural Resources Council, we considered whether a drainage district had complete authority over construction of improvements under chapter 468 or whether the Iowa Natural Resources Council (INRC) had the power to approve or deny permits for such construction under Iowa Code chapter 465A. 377 N.W.2d 236, 239-40 (Iowa 1986). We held that the INRC had concurrent authority over such construction. Id. at 241. We emphasized that when two statutes deal with the same subject, courts endeavor to give effect to both enactments. Id. While drainage district statutes were to be liberally construed, according to the Polk County court, environmental policy statutes were also to be liberally construed because of the important policy considerations underlying them. Id. Polk County stands for the proposition that claims of exclusive authority by drainage districts must give way to an environmental policy statute governing the same subject matter.
F. No Money Damages for Torts. As can be seen above, we have, in a number of cases, refused to allow an award of money damages against a drainage district. But our statements in that regard have been sometimes limited. For example, in Fisher, we considered' a case where plaintiffs experienced flooding problems because of the operation of a drainage district. 369 N.W.2d at 427. On the question of money damages, we offered the limited observation that drainage districts have no corporate existence “for that purpose.” Id. at 429. We also offered the broad characterization that the unavailability of money damages against a drainage district amounted to “immunity from suit in tort.” Id. at 430..
The- next case of interest is Gard, 521 N.W.2d at 696. In Gard, we rejected a claim for money damages by the estate of drowned boaters. Id. at 699. We cited Fisher for the proposition that drainage districts have limited powers. Id. at 698. We emphasized the narrow proposition that “Iowa has never allowed tort claims for money damages to be made against a drainage district.” Id. (emphasis added).
We made a similar declaration in Chicago Central. Although it was in the context of reimbursement for a repair, we restated that although mandamus was available to cause a drainage district to do its duty, money damages were not an available remedy. Chicago Cent., 816 N.W.2d at 378.
G. Silence! Post Home Rule Cases. Finally, there is one more observation that must be made regarding our drainage district easelaw. No-money-damages cases like Fisher and Gard emphasize the limited nature of drainage district authority. See Gard, 521 N.W.2d at 698; Fisher, 369 N.W.2d at 429. Yet, in 1978, Iowa passed an amendment to the Iowa Constitution establishing county home rule. Iowa Const, art. Ill, § 39A. Under county home rule, the so-called Dillon rule is abolished and local governments have broadened powers. *84 Polk Cty. Bd. of Supervisors v. Polk Commonwealth Charter Comm’n, 522 N.W.2d 788, 790-91 (Iowa 1994). While several of our drainage district cases occurred after the enactment of the county home rule amendment, none of them consider the impact of home rule on our cases. In this case, DMWW claims that Fisher and Gard are no longer viable authority because the power of drainage districts is no longer limited as it was prior to county home rule.
IY. Potential Remedies Against Drainage Districts.
A. Introduction. It seems to me that much of the rhetoric of our drainage district cases is not entirely accurate. The notion that drainage districts are not entities strikes me as simply wrong. Further, although we declare that drainage districts have “immunity” from money damages, I am not sure that is an accurate description of what our caselaw in fact supports. I do not see in our cases a legislative or judicial policy judgment that drainage districts should be generally immune from potential damages in tort.
Instead, I conclude that the real issue at stake here is not whether we should abandon the wrong-headed notion that drainage districts are not entities or whether we should abrogate some kind of immunity based upon some perception of public policy. The real question relates to the ability, or lack of ability, of a drainage district to comply with a court-ordered damage or injunctive remedy related to pollution. I am inclined to agree with the drainage district that an injunction against a state official “is utterly meaningless” when the official against whom the injunction is granted lacks the power to redress the associated injuries. Okpalobi v. Foster, 244 F.3d 405, 426-27 (5th Cir. 2001). In short, the remedies questions posed in this case are about whether the defendants have the authority to comply with a potential judgment for money damages or an injunction fashioned to abate a nuisance should the DMWW prevail on its substantive nuisance claims. These are questions of law, not fact.
B. Money Damages and Application of Stare Decisis.
1. Introduction. On the issue of money damages, the drainage district defendants argue that we are bound by stare decisis to follow our precedents. As shown above, in several contexts, our cases proclaim that money damages in tort are not available against drainage districts, most persuasively because of their limited statutory powers.
DMWW draws our attention to three potential problems. First, DMWW attacks the general reasoning employed in our no-money-damages cases and invites us to abandon them as a relic of the past. Second, DMWW points out that our no-money-damages cases do not involve cases concerning pollution or, more narrowly, pollution allegedly arising in violation of statutory nuisance. Third, DMWW challenges the reasoning of our cases refusing to allow money damages. Finally, DMWW contends that even if our cases might be otherwise entitled to stare decisis, the enactment of county home rule in 1978 deprives these cases of their precedential value.
2. Rationale of no-money-damages eases. To some extent, I agree with DMWW that some of the reasoning employed in our no-money-damages caselaw is flawed. As indicated above, I do not accept the no-legal-entity line of reasoning or the characterization of nonliability as’ based on immunity. What I do think is at play in our cases, however, is the notion that drainage districts have limited statutory powers and that these powers do not *85 include the ability to pay money damages. Certainly, as the drainage district defendants point out, DMWW has been unable to point to any statutory provision in the more than six hundred sections of Iowa Code chapter 468 that expressly authorizes payment of money damages.
We have long held, even in the pre-home rule days, that local government authority includes not only what is expressed but also what is necessarily implied. See, e.g., Woodbury County v. Anderson, 164 N.W.2d 129, 134 (Iowa 1969); In re Estate of Frentress, 249 Iowa 783, 786, 89 N.W.2d 367, 368 (1968). There is, perhaps, an argument that the power to pay for money damages should be necessarily implied from chapter 468, but I do not find such an implication compelling. At the time chapter 468 was enacted, sovereign immunity was the rule and not the exception. I doubt that the legislature intended when it granted the drainage districts limited express powers to imply a power that under prevailing law was not generally available absent legislative consent. I thus conclude that the argument that drainage districts have an implied power to pay money damages does not have much merit.
•3. Broad case holdings and stare deci-sis. The next question I consider is whether the cases that might be entitled to stare decisis cover the present controversy. DMWW is correct that cases like Fisher, Gard, and Chicago Central do not involve pollution matters. And, in particular, they do not arise in the context of claimed violation of duties arising out of other statutes such as statutory nuisance. Iowa Code § 657.2(4). Yet, the language of the cases is quite broad—“Iowa has never allowed tort claims for money damages to be made against a drainage district”! Gard, 521 N.W.2d at 698.
The question is whether prior broad statements of law are entitled to stare decisis even when the facts of a subsequent case are arguably distinguishable. See, e.g., Indep. Inst. v. FEC, 816 F.3d 113, 117 (D.C. Cir. 2016) (“The nature of our system of legal precedent is that later cases often distinguish prior cases based on sometimes slight differences.”); Richard M. Re, Narrowing Supreme Court Precedent from Below, 104 Geo. L.J. 921, 924-25 (2016) (describing how lower federal courts will often “narrow from below” outdated or ambiguous Supreme Court precedents); Richard M. Re, Narrowing Precedent in the Supreme Court, 114 Colum. L. Rev. 1861, 1875-89 (2014) (arguing that healthy stare decisis can require methods of narrowing broadly stated precedent in order to avoid overruling a case when its “best reading,” i.e. the. precedent as actually stated, would require an outcome inconsistent with other legal principles). Of course, the next case is always different, in some way, from prior cases. But at the same time, context matters. The question is whether a broad legal expression is binding in the contexts other than that in which it has arisen? .Here, unlike in Fisher, Gard, and Chicago Central, a statute outside of Iowa Code chapter 468 imposes a duty not to create or continue a nuisance— no similar, statutory duties were present in the cases disallowing money damages.
I do not have a very clear answer for this interesting question. There is considerable appeal to the argument that broad statements of law are binding only in the factual setting' from which they arise and are really only dicta with respect to other claims. The law constantly evolves by distinguishing past precedent based on factual differences. As is apparent from this opinion, I regard many of the issues posed in this case as abundantly nuanced and contextual. Certainly we can all agree that we have never considered the potential liability of drainage districts in the context *86 of a claim that the operation causes violation of federal pollution law.
We should be particularly alert to avoid masking preferred policy choices in a stare decisis costume. And, an overburdened court may be tempted to over read precedent in the name of efficiency and quick results, but such an approach runs the risk of uncritical dispositions.
Yet, notions of nuance and context could be extended so far that there would almost never be an occasion to apply stare decisis and literally nothing would ever be settled in the law. In close cases, the determination of whether to apply stare decisis is a matter of judgment, not inexorable command.
It seems to me that one relevant line of inquiry is whether a reasonable drainage district would rely on the statements in our caselaw as binding in the structuring of its financial and business affairs. In our cases, particularly Gard and Chicago Central, the statements about money damages are emphatic and were made in contexts where the plaintiffs’ claims had considerable equitable appeal. Yet, in Iowa Employment Security, the drainage district was required to pay money—not damages in tort, perhaps, but money nonetheless—to a government agency based on statutory requirements outside of Iowa Code chapter 468. See 260 Iowa at 346-47, 149 N.W.2d at 291. And, in Polk County, we recognized that environmental regulations would be enforced in the face of a claim that drainage districts had exclusive jurisdiction for matters within the scope of its authority. See 377 N.W.2d at 241. Yet, the issue here is not regulatory enforcement, as in Polk County, or payment of money to government entity, as required in Iowa Employment Security, but a question of money damages for an alleged civil wrong.
Although a close question, I am inclined to go along with the application of stare decisis on the question of the availability of money damages in this case. The most valid rationale for the no-money-damages approach—that a drainage district has limited powers—is a broad proposition that applies across the board.[16] Further, it seems to me that a reasonable drainage district might forgo the possibility of insurance in light of our caselaw. See, e.g., State v. Peeler, 321 Conn. 375, 140 A.3d 811, 857 (2016) (Zarella, J., dissenting) (noting, among other costs to individuals of overturning precedent, the impact on risk-shifting arrangements like insurance policies); Crist v. Hunan Palace, Inc., 277 Kan. 706, 89 P.3d 573, 580 (2004) (declining to overrule precedent in part because insureds and insurance companies had relied on the precedent in purchasing and crafting insurance policies); Paige v. City of Sterling Heights, 476 Mich. 495, 720 N.W.2d 219, 228-29 (2006) (overruling a prior decision because, in part, the precedent did not cause large numbers of people to attempt to conform their conduct to the decision by, for example, deciding whether to purchase insurance or not). Further, where the result of precedent is defensible and the legislature has had a relatively recent reminder in Chicago Central four years ago, we should be cautious to reexamine precedent. See Doe v. New London Cmty. Sch. Dist., 848 N.W.2d 347, 355 (Iowa 2014); Ackelson v. Manley Toy Direct, L.L.C., 832 N.W.2d 678, 688 (Iowa *87 2013). So, although I am not completely confident in the result, I am inclined to conclude that stare decisis precludes our reconsideration of our caselaw that generally stands for the proposition that money damages are not an available remedy against drainage districts.
4. Impact of county home rule amendment. DMWW argues that our prior precedent is based on perceived limitations in the statutory authority of drainage districts. DMWW asserts that this rationale is no longer applicable in light of the enactment of the county home rule amendment to the Iowa Constitution. Under the county home rule amendment, counties are no longer subject to the Dillon rule, which stated that local governments only have those powers expressly granted or necessarily applied or necessarily implied. See Iowa Const, art. Ill, § 39A; cf. City of Des Moines v. Master Builders of Iowa, 498 N.W.2d 702, 703 (Iowa 1993) (en banc) (considering the home rule amendment as applied to city government). DMWW argues that drainage districts, as subdivisions of the county, now have larger powers, including the power to pay money damages for environmental pollution. DMWW correctly asserts that our post-county home rule cases, Fisher, Gard, and Chicago Central, do not address the question of whether home rule impacts the no-money-damages rule.
The majority indicates that even if they have the benefit of home rule, the drainage districts do not have the power to tax beyond that authorized by the general assembly. That is, of course, an accurate proposition. Yet, the Iowa Constitution expressly vests authority in drainage districts to impose special assessments. Iowa Const, art. I, § 18. Further, we have held that special assessments do not necessarily amount to a tax. Bennett v. Greenwalt, 226 Iowa 1113, 1134, 286 N.W. 722, 732 (1939). Thus, the relevant question is whether a drainage district may use its expressly authorized special assessment power to pay money damages arising from pollution. I am not sure of the answer to this question if home rule applies to drainage districts.
But, I doubt that county home rule applies to drainage districts. The county home rule amendment applies only to “counties” or “joint county-munieipal corporations.” A county, however, has not been named as a defendant in this litigation. Although constitutional language is often open textured and our interpretation must show fidelity to the underlying constitutional values animating the language, a drainage district is not the same as a county, but instead is a governmental subdivision of the county in which they are located. Iowa Employment Security, 260 Iowa at 346, 149 N.W.2d at 291. The question is thus whether the unquestionably broad home rule of a county is vicariously passed on to a subdivision of the county.
It is my conclusion that drainage districts do not come within the scope of the county home rule amendment. The county home rule amendment was directed to county and county-municipal corporations that exercise general police powers and not to tightly regulated, limited purpose entities like a drainage district whose governing structure, to some extent, merely overlaps with county government. See Fountain City Sanitary Dist. v. Knox Cty. Election Comm’n, 203 Tenn. 26, 308 S.W.2d 482, 486 (1967) (Swepston, J., concurring) (explaining that drainage districts, as quasi-municipal corporations, were not intended to be included -within the ambit of the home rule amendment); Union High Sch. Dist. No. 1 v. Taxpayers of Union High Sch. Dist. No. 1, 26 Wash.2d 1, 172 P.2d 591, 596 (1946) (holding that a municipal-corporation, in this case a high school district, was not granted powers of home *88 rule unless the statutory language creating the municipal corporation clearly showed the legislature’s intent to grant home rule powers); see also Philip A. Trautman, Legislative Control of Municipal Corporations . in Washington, 38 Wash. L. Rev. 743, 745 (1963).
C. State Constitutional Challenges to “Immunity” for Money Damages Based on Due Process, Equal Protection, and Inalienable Rights. Assuming as a matter of law that money damages are not available, DMWW raises due process, equal protection, and inalienable rights arguments under the Iowa Constitution challenging this state of affairs. DMWW asserts that the judicially created doctrine of immunity from money damages simply has to be abandoned. DMWW claims that Iowa constitutional infirmities arise from such an irrational and arbitrary state of affairs when most governmental entities are liable for such money damages but drainage districts are not.
DMWW argues by analogy based on our decisions in cases including Miller v. Boone County Hospital, 394 N.W.2d 776 (Iowa 1986), Gacke, 684 N.W.2d 168, and Hensler v. City of Davenport, 790 N.W.2d 569 (Iowa 2010). In Miller, we struck down a statute imposing more stringent procedural requirements on tort claims against local governments on equal, protection grounds. 394 N.W.2d at 781. In Gacke, we held that an immunity provision in Iowa Code section 657.11(2) exempting certain livestock operators from nuisance claims amounted to a per se taking under the Iowa Constitution. 684 N.W.2d at 174-75. In Hensler, we developed a two-step process for determining whether a particular state action violates substantive due process, including a determination of whether a right is fundamental which, DMWW asserts, certainly includes its right to compensation for environmental harms. See 790 N.W.2d at 580-81. DMWW maintains that if, in fact, drainage districts are immune from nuisance damages, such immunity is constitutionally infirm under the equal protection, due process, and inalienable rights clauses of the Iowa Constitution as applied in Miller, Gacke, and Hen-sler.
If the plaintiff in this case was a citizen as in Miller, Gacke, and Hensler, DMWW’s argument would need to be confronted. But this case involves a government subdivision suing another government subdivision for alleged damages from environmental harm. While our cases on drainage districts use the term “immunity,” which inevitably gives rise to the comparison with Gacke, the comparison is flawed. While the cases are sometimes couched in immunity language, the use of the term “immunity” is inaccurate. The real issue, to me, is a limitation of the power of drainage districts compared to other entities.
Where the crux of the constitutional issue is the constitutional validity of a limitation on the power of a government subdivision, our caselaw suggests that another government subdivision does not have the power to bring these claims. See Bd. of Supervisors v. Dep’t of Revenue, 263 N.W.2d 227, 232 (Iowa 1978). If a government subdivision cannot complain of any act of the legislature diminishing its revenue, amending its charter, or even dissolving it, it may be argued that DMWW as a legislative creature cannot attack the limitations of power of another legislative creature, the drainage district, absent a clear constitutional command to the contrary. See McSurely v. McGrew, 140 Iowa 163, 170, 118 N.W. 415, 418-19 (Iowa 1908).
On this very narrow point, I concur with the result of the majority with respect to the equal protection, due process, and in *89 alienable rights claims attacking the lack of authority of the drainage district defendants to pay money damages for common law or statutory torts. I do not, however, opine more generally on standing issues involving government subdivisions as plaintiffs. In particular, as will be explained below, I conclude that DMWW may raise a takings claim under article I, section 18 of the Iowa Constitution against the drainage district defendants.
D. Equitable Relief to Abate Nuisance,
1. Introduction. The question of whether equitable remedies are available to abate an alleged nuisance caused by drainage districts raises a fundamentally different question than the money damages controversy. In order to address this different question, I first consider whether injunc-tive relief is available against drainage districts generally. I then turn to the question of whether nuisance provides a substantive legal basis for an injunction in a pollution context generally. Next, I consider whether an injunction to abate a nuisance arising from alleged pollution may be entered against drainage districts. Finally, I consider the merits of DMWWs contention that it is entitled to seek injunctive relief if it can prove its nuisance case under the facts presented to us by the certifying federal court in this case.
2. Availability of injunctive relief against drainage districts generally. The question here is whether injunctive relief is part of a judicial tool kit that might be available to the district court in the event that'DMWW demonstrates an entitlement to relief. The mere fact that money damages are not available, even if based on immunity, does not prevent the availability of equitable relief. While our cases repeatedly assert that money damages are not available, our cases clearly state that equitable relief is available against drainage districts. For example, we have said the equitable. remedy of mandamus is available to order members of the board of supervisors to ensure that the drainage district meets a mandatory legal duty. Wise, 242 Iowa at 874, 48 N.W.2d at 249. We have said that injunctive relief is available to order a drainage district to repay money assessed pursuant to a void repair contract. Voogd, 188 N.W.2d at 393.
I am not sure the fine distinction between mandamus and injunction matters much. We have said that mandamus would lie to compel a city to abate a continuing public nuisance where it was under a duty to abate the nuisance. Cowin v. City of Waterloo, 237 Iowa 202, 212-13, 21 N.W.2d 705, 710 (1946). In Wise, mandamus was issued when there was a clear duty, yet no detailed instructions - regarding how the district could meet that duty. 242 Iowa at 874, 48 N.W.2d at 249. Whether or not DMWW can make the case for a Wise-type remedy is of course not clear at this early point in the litigation.
And, it seems to me that injunctive relief in a proper case should be available, too. The value of injunctive relief is that it allows the district court to shape the remedy to meet the contours of the problem. See Brown v. Voss, 105 Wash.2d 366, 715 P.2d 514, 517 (1986) (en banc) (noting that a district court has broad discretionary power to shape injunctive relief to the particular facts, circumstances, and equities of the case); accord N. Star State Bank of Roseville v. N. Star Bank Minn., 361 N.W.2d 889, 895 (Minn. Ct. App. 1985); Reprod. Health Servs., Inc. v. Lee, 660 S.W.2d 330, 335 (Mo. Ct. App. 1983); Rhett v. Gray, 401 S.C. 478, 736 S.E.2d 873, 882 (Ct. App. 2012). In modern law, injunctions are available to meet a wide variety of problems. See Stephens v. Borgman, 202 Okla. 41, 210 P.2d 176, 183 (1949) (Davison, *90 C.J., dissenting) (asserting that, while in-junctive relief was originally used sparingly by courts of equity, the modern tendency is to grant injunctions when a clear showing is made of a continuing or likely to be repeated wrong); Pearce v. Pearce, 37 Wash.2d 918, 226 P.2d 895, 897 (1951) (“We recognize and approve the modern tendency to protect personal rights by in-junctive relief where there is no adequate remedy at law.”)- I do not see a reason why the remedy should not be available if DMWW makes the appropriate legal and factual showing supporting its claim.
The drainage districts suggest that because the development of drainage infrastructure is authorized by law, it cannot be a nuisance. The law is otherwise. McQuil-lan instructs us, for instance, that a municipality cannot escape liability because a construction was authorized by statute. 18 Eugene McQuillan, The Law of Municipal Corporations § 53:77.24, at 624-25 (3d ed. 2013) [hereinafter McQuillan]. There is ample authority for this proposition. We said as much in Kriener, 212 N.W.2d at 530, 535 (canvassing Iowa law and holding the existence of nuisance not affected by lawfulness of an offending establishment). There is also ample authority from other jurisdictions. See, e.g., Friends of H St. v. City of Sacramento, 20 Cal.App.4th 152, 24 Cal.Rptr.2d 607, 611 (1993); Delta Air Corp. v. Kersey, 193 Ga. 862, 20 S.E.2d 245, 250 (1942); Webb v. Town of Rye, 108 N.H. 147, 230 A.2d 223, 226 (1967). Ordinarily, a municipality is liable for maintaining or contributing to a nuisance to the same extent as an individual. Miller v. Town of Ankeny, 253 Iowa 1055, 1061, 114 N.W.2d 910, 914 (1962) (upholding instruction that would allow town to be held liable for improper construction and operation of a sewage treatment plant resulting in a nuisance); McQuillan § 53:77.24, at 627-28 & n.11.
3. Nuisance as basis for equitable relief to abate pollution generally. I now examine the underlying substantive basis of DMWWs claim for the remedy of an injunction. DMWW claims that Iowa nuisance law provides a basis for equitable relief.
We recently canvassed the application of nuisance law to environmental matters in Freeman, 848 N.W.2d at 66-69. As we noted in Freeman, common law nuisance theory has provided a remedy for environmental wrongs reaching back into the seventeenth century. Id. at 66. We noted in Freeman the availability of nuisance to address environmental harms was endorsed by the Restatement (Second) of Torts, which included sections on both public and private nuisance. Id.] see Restatement (Second) of Torts §§ 821B-821E, at 87-104 (1979). We quoted a leading commentator who noted that nuisance “continues to be the fulcrum of what is called today environmental law.” Freeman, 848 N.W.2d at 66-67 (quoting 1 William H. Rodgers, Jr., Environmental Law: Air and Water § 2.1, at 29 (1986)). We noted in Freeman that nuisance theory had been recognized in Iowa for decades in the environmental contexts. Id. at 67; see also Kriener, 212 N.W.2d at 536 (finding noxious odor from sewage facility amounted to a private nuisance); Ryan v. City of Emmetsburg, 232 Iowa 600, 603, 4 N.W.2d 435, 438 (1942) (concerning a private nuisance arising from sewer system).
We further recognized in Freeman that the Iowa legislature explicitly endorsed nuisance theory by enacting a statutory nuisance action in Iowa Code section 657.1. 848 N.W.2d at 67. We have consistently held that the statutory nuisance provisions do not preempt common law nuisance claims but supplement them. Id.
In Freeman, we recognized the modern trend to control the environment through *91 the enactment of regulatory statutory regimes. Id. at 68-69. We pointed out in Freeman, however, that the purpose of regulatory statutory environmental regimes was to protect the public generally and not to provide a remedy for special harms to property at a specific location. Id. at 69. As a result, we held that applicable provisions of the Clean Air Act did not preempt state common law nuisance claims. Id. at 84-85.
Freeman involved a case of air pollution, not water pollution. But, under a Freeman-type analysis, nuisance theory provides a potential basis for an injunction in cases involving water pollution that has not been preempted by state or federal statutes dealing with water pollution.
4. Appropriateness of nuisance remedy against drainage districts. From a policy perspective, the process of adjudication of nuisance claims—with the rules of evidence, the orderly development of a record, thorough consideration by a fair and impartial trial judge, and the possibility of appeal to a dispassionate appellate court— has many attractive qualities. Plaintiffs bear the burden of proving causation, and the degree of harm is based in fact, not supposition. Remedies are specifically sculpted to meet the factual showing of the plaintiffs.
The case-by-case nuisance approach is consistent with what is known in environmental law as the PPP, or the “polluter pays principle.” The PPP principle is recognized as a norm in international environmental law and, according to one commentator, should apply when agricultural activities impose environmental harm that affects private and public property. See Margaret Rosso Grossman, Agriculture and the Polluter Pays Principle: An Introduction, 59 Okla. L. Rev. 1, 3 (2006); Boris N. Mamlyuk, Analyzing the Polluter Pays Principle Through Law and Economics, 18 Se. Envtl. L.J. 39, 42 (2009); Ved P. Nanda, Agriculture and the Polluter Pays Principle, 54 Am. J. Comp. L. 317, 319-20 (2006).
The majority suggests that solutions to water quality are better advanced by the “elected branches of government who are responsible to the people.” The majority ignores the fact that the legislature has enacted a nuisance statute that DMWW seeks to enforce. See Iowa Code ch. 657. The Iowa legislature, unlike the majority, has thus generally endorsed nuisance as a means of environmental protection. It has provided a specific statutory mechanism for abatement of nuisances and payment of expenses associated with abatement. See Iowa Code § 657.7. The legislature added an exclamation point by making the creation or continuing of a nuisance a criminal offense. See id. § 657.3.
And, tellingly, the legislature crafted a narrow exception to Iowa Code chapter 657 for certain animal feeding operations.[17] Id. § 657.11(2). That is the only exception in chapter 657. The legislature thus contemplated who might be exempt from nuisance requirements generally. It did not exempt drainage districts. See Reyes-Fuentes v. Shannon Produce Farm, Inc., 671 F.Supp.2d 1365, 1369 (S.D. Ga. 2009) (finding that the expression of one exception in a statute implies the exclusion of other exceptions); accord Pugliese v. Pukka Dev., Inc., 550 F.3d 1299, 1304 (11th Cir. 2008); Winkle v. State, 310 Ark. 713, 841 S.W.2d 589, 591 (1992); In re Cadwell’s Estate, 26 Wyo. 412, 186 P. 499, 501 (1920).
5. Relevant drainage district caselaw regarding nuisance claims. DMWW seeks relief in this case under both common law and statutory nuisance theories. As indi *92 cated above, there is nothing in our case-law suggesting that equitable remedies are not available to abate pollution allegedly caused by drainage districts. In Vogt, we allowed a damages remedy in a case brought against a city for discharging sewage into the stream to the material injury of lower riparian owners. 133 Iowa at 363, 110 N.W. at 603-04. Nothing in the case indicated equitable relief was not available for this type of harm. While we denied an injunction against a drainage district in Maben, we took great pains to distinguish overflow from environmental nuisances. 187 Iowa at 1068, 176 N.W. at 515-16. Finally, we granted an injunction against a drainage district in Voogd to prohibit the collection of additional installment payments. 188 N.W.2d at 395.
Further, we have held in several cases that equitable remedies are available against the management of a drainage district to force compliance with the law. To me, in addition to cases like Iowa Employment Security, these cases are the death knell of the no-legal-entity approach in other cases, an obvious proposition not recognized by the majority. And, if mandamus is available in an appropriate case, as our cases clearly establish, why would in-junctive relief not be available in an appropriate case, as it was in Voogd?
Thus, unlike on the question of money damages, our cases do not uniformly and clearly hold that injunctive relief is not available in the context of a pollution case. Indeed, if anything, they suggest that an injunction might be available in proper circumstances. Our cases are plainly not entitled to stare decisis on the question of availability of an injunction to abate a nuisance because there has been no clear and definitive ruling on the issue as framed in this case. I now turn to the live-wire substantive question—whether an injunction is precluded as a matter of law in this case at this early stage of the litigation.
6. Availability of injunction to abate nuisance in this case. Assuming injunctive relief is available in appropriate cases, as I do, the next question is whether a nuisance action is available to the plaintiffs to abate environmental harms. As we noted in Freeman, the Iowa legislature has enacted a provision establishing a statutory nuisance claim that supplements and does not supplant common law nuisance. 848 N.W.2d at 67. Further, in Freeman, it is noteworthy that a comprehensive federal regulatory framework did not preempt state nuisance regulation. Id. at 69-70. Nuisance law is a sturdy feature of the Iowa legal landscape.
The defendants argue that Iowa Code section 468.2(1) precludes such a nuisance action. That provision provides, “The drainage of surface waters from agricultural lands and all other lands, including state-owned lakes and wetlands, or the protection of such lands from overflow shall be presumed to be a public benefit and conducive to the public health, convenience, and welfare.” Iowa Code § 468.2(1).
In my view, the statute does not categorically eliminate nuisance claims. It only establishes a presumption that the activities of a drainage district are in the public interest, but that presumption may be rebutted. Our rule of thumb is that a statutory presumption is rebuttable, not conclusive, unless the legislature has clearly expressed an intent to the contrary by saying it is conclusive. Larsen v. Bd. of Trs., 401 N.W.2d 860, 863 (Iowa 1987) (Wolle, J., dissenting); Neighbors v. Iowa Elec. Light & Power Co., 175 N.W.2d 97, 102 (Iowa 1970). The majority is wrong to think otherwise.
My view is supported by an examination of other provisions of Iowa Code chapter 468 where the legislature, unlike in section *93 468.2(1), did use language establishing conclusive or irrebutable presumptions. Specifically, Iowa Code section 468.47 is entitled “Evidence—conclusive presumptions” and provides that no evidence is “competent to show that any of the lands in [a drainage] district ... will not be benefited by [an] improvement in some degree.” A similar provision, - with an escape clause, may be found in Iowa Code section 468.92, entitled “Conclusive presumption on appeal.” Similarly, Iowa Code section 468.171 is entitled “Conclusive presumption of legality.” This section states a final order of a drainage district “shall be conclusive that all prior proceedings were regular and according to law,”
Plainly, the legislature knows how to establish conclusive presumptions. It repeatedly did so in three sections of chapter 468, two involving a question of fact, another involving a question of law. It did not do so in section 468.2(1). To judicially caret in the term “conclusive” in section 468.2(1) would be to rewrite the statute. We should decline that invitation. See In re A.M., 856 N.W.2d 365, 378 (Iowa 2014) (“We are not free to rewrite a statute in the guise of interpretation.”).
Yet, as with the issue of money damages, the question remains whether a drainage district would have the statutory authority to comply with a mandamus or injunction to abate a nuisance. The statutory powers of a drainage district include the power to engage in repairs and improvements in a drainage district. Iowa Code § 468.126. The Code further provides that the powers of a drainage district are to be liberally construed. Id. § 468.2; see also Clary, 135 Iowa at 495, 113 N.W. at 333. Yet, the question remains whether a drainage district may take affirmative steps to abate a nuisance under the maintain-and-repair provisions of the statute.
Iowa Code chapter 468 has statutory provisions related to repairs and improvements. Under the repair provision of Iowa Code section 468.126(l)(a), the board of supervisors is authorized to
restore or maintain a drainage or levee improvement in its original efficiency or capacity, and for that purpose may remove silt and debris, repair any damaged structures, remove weeds and other vegetable growth, and whatever else may be needed to restore or maintain such efficiency or capacity or to prolong its useful life.
Under the improvement provision of Iowa Code section 468.126(4)(a), the board of supervisors is authorized to engage in improvements, An “improvement” is defined as a project “to expand, enlarge, or otherwise increase the capacity of any existing ditch, drain, or-other facility above that for which it was designed.” Iowa Code § 468.126(4).
The question becomes whether under these repair-and-improvement provisions a drainage district would have authority to implement whatever abatement measures that might be required to remove nitrates from the water which it allegedly collects and deposits in the Raccoon River. An argument may be made that the power to abate a nuisance due to nitrate pollution does not fall into the express terms of these statutes. Any would-be abatement effqrt does not seem to be a repair in the sense of an action to “restore or maintain a[n] ... improvement in its original efficiency or capacity,” Id. § 468.126(l)(a). And, it can be argued that abating a nuisance is, not an improvement because it fails to “expand, enlarge, or otherwise increase the capacity of any existing ditch, drain, or other facility.” Id. § 468.126(4).
But if the power to abate a nuisance is not expressly stated, is it necessarily implied? See In re Estate of Frentress, 249 *94 Iowa at 786, 89 N.W.2d at 368. Iowa Code chapter 657, which has been around in one form or another for a long time, states that it is a nuisance to pollute rivers and streams. Iowa Code § 657.2(4). It is a crime to create or continue a nuisance. Id. § 657.3. There is no pollution exception in the law for drainage districts. Does the power to create, repair, and maintain a drainage district necessarily imply the duty to comply with a generally applicable nuisance statute that includes criminal penalties for noncompliance and for which drainage districts are not exempted?
I conclude that it does. In particular, it seems to me that the Maben case takes great pains to distinguish overflow cases, for which no remedy is available against drainage districts, from pollution cases. See 187 Iowa at 1068-70, 175 N.W. at 515-16. If there was no potential exposure of drainage districts for pollution-type claims, it would not have been necessary to draw the distinction. While it would be claiming too much to suggest that the mere fact that the Maben case distinguished pollution cases is determinative on the issue before us, it does give us at least some insight into contemporary thinking closer to the time of the creation of drainage districts.
Further, it seems to me necessarily implied that if the drainage district has the power to build a drainage system, it necessarily has the power to build it in compliance with generally applicable law affecting public health. There are no germane exemptions from external statutory requirements in the extensive drainage district statute. Of course, the Maben reasoning is correct in that there simply cannot be an overflow claim because the removal of water from an area of land and introducing that water into rivers is precisely what drainage districts do. Id. at 1063-64, 175 N.W. at 513-14. Allowing an overflow action would thus devour the entire statute. But the fact that an overflow claim cannot be made has no bearing at all upon the pollution claim presented in this case. Further, the holdings in Iowa Employment Security and Polk County demonstrate that drainage districts have duties outside the scope of Iowa Code chapter 468. See Polk County, 377 N.W.2d at 241; Iowa Emp’t Sec., 260 Iowa at 347, 149 N.W.2d at 291.
I conclude only at this juncture that an injunctive claim based upon nuisance law is not precluded as a matter of law at this early stage of the litigation. See City of Springfield v. N. Fork Drainage Dist, 249 Ill.App. 133, 152 (1928) (permitting a city to sue drainage district for pollution); Township of Hatfield v. Lansdale Mun. Auth., 403 Pa. 113, 168 A.2d 333, 334 (1961) (affirming municipality’s requested injunction against water authority). The DMWW raises claims not with respect to the legislature’s distribution of power, but claims related to the improper exercise of power that the legislature had conferred.
This does not mean, of course, that a court should accept the facts are as alleged by DMWW. Under my approach, DMWW would carry the burden of proving its factual allegations. Further, even if the facts are proved, I do not believe that DMWW would necessarily be entitled to an injunction. In my view, the drainage district defendants should be allowed to assert affirmative defenses about which we have no occasion to now opine. An injunction is an equitable remedy. Any court considering whether to grant an injunction in a nuisance case must balance the equities by determining, among other things, the scope of the problem and the benefits and burdens of any proposed abatement. See Ronald J. Rychlak, Common-Law Remedies for Environmental Wrongs: The Role *95 of Private Nuisance, 59 Miss. L.J. 657, 689-93 (1989).
The majority suggests, without any instructions from the certifying court or factual basis in the nonexistent record, that the most efficient cost avoider may be the DMWW and not the drainage district. For busy courts seeking to maximize efficiency, and particularly federal courts, there is a temptation to terminate litigation prematurely based on the perceived factual merits of the underlying controversy. Although the question of most efficient cost avoider may be a factor when the court considers whether equitable relief is appropriate at the end of the litigation, such speculation cannot be used to slam the courthouse doors on DMWW at the beginning of the litigation. And, it may also be that certain actions that might effectively abate the nuisance are not, in fact, within the power of the drainage district. That possibility, however, goes to the merits of this case and cannot be used, as a matter of law, to terminate this proceeding.
For the above reasons, I conclude that DMWW should be allowed to attempt to make its case on its injunctive claim against the drainage district defendants when the plaintiff seeks compliance with common and statutory environmental regulations.
V. Takings Claim Arising from Alleged Pollution of Raccoon River.
A. Introduction. I now turn to the question of whether DMWW may bring a takings claim against the drainage district defendants arising out of DMWW’s assertion that because of pollution their right to clean water has been impaired and that the invasion of the nitrates into the DMWW property amounts to a trespass.
First, I consider whether DMWW, as a governmental subdivision, has any property which may fall within the scope of property protected from uncompensated takings. Second, I consider whether one governmental subdivision may bring a takings claim against another governmental subdivision. Third, I consider whether DMWW, by alleging that the drainage districts have polluted the Raccoon River, has alleged a taking of a compensable property interest. Fourth, I consider whether the legislative authorization to build drainage districts defeats the takings claim in this case.
B. Takings Claim of Government Bodies: The Question of Private Property.
1. Overview. There is a relatively small body of literature and a large body of caselaw relating to the question of whether a governmental subdivision may bring a takings claim which is limited to “private property.” See Iowa Const, art. I, § 18 (“Private property shall not be taken for public use without just compensation first being made.... ”). The prevailing view is that municipal governments may bring takings claims when other governmental entities seize property, at least under certain circumstances.
2. United States Supreme Court caselaw on government as holder of private property: A stranger in town. The United States Supreme Court has considered the question of whether a government entity may be entitled to a takings claim when the United States seizes its property. The central question, of course, was whether government-owned property could be considered “private property” for purposes of the Fifth Amendment.
The Supreme Court’s key case is United 105 S.Ct. 451, 83 L.Ed.2d 376 (1984). In 50 Acres, the Supreme Court concluded that property held by local government could *96 be considered private property for takings purposes under the Fifth Amendment. Id. at 31, 105 S.Ct. at 455-56, 83 L.Ed.2d at 383. The thrust of the rationale was that the loss to the government entity may be as severe as the loss to a private person.pr entity. Id. at 31, 105 S.Ct. at 455, 83 L.Ed.2d at 383. According to the 50 Acres Court,
When the United States condemns a local public facility, the loss to the public entity, to the persons served by it, and to the local taxpayers may be no less acute than the loss in the taking. of private property. Therefore, it is most reasonable to construe the reference to “private property” in the Takings Clause of the Fifth Amendment as encompassing the property of state and local governments when condemned by the United States.
Id. at 31, 105 S.Ct. at 455-56, 83 L.Ed. 2d at 383.
The case turned on two features. First, as indicated above, the term “private property” was not narrowly construed but instead was subject to a functional approach based on the impact of the deprivation on local government. Second, however, one commentator has referred to the case’s “stranger in town” aspect—namely, the fact that 50 Acres involved a takings claim by a municipality against a different sovereign. See. John M. Payne, Intergovernmental Condemnation as a Problem in Public Finance, 61 Tex. L. Rev. 949, 954 & n.17 (1983); see also United States v. Carmack, 329 U.S. 230, 242, 67 S.Ct. 252, 257, 91 L.Ed. 209, 217 (1946); Trenton, 262 U.S. at 188, 43 S.Ct. at 537, 67 L.Ed. at 941.
Undeniably, 50 Acres and its progeny involved local government takings claims against the federal government. Thus, the taking authority was thought to be a “stranger in town” in the sense that there was no direct legal relationship between the taker and the party suffering the loss.[18] Yet, the case unmistakably stands for the proposition, not at all binding on state courts construing their state constitutions, that the property of a governmental subdivision might be considered “private property” for takings purposes. ,
3. State law authority on government property as “private." State courts have grappled with the question of whether government subdivision property should be considered “private” for takings purposes. Like 50 Acres, the state caselaw often reflects a functional approach to the question.
The general theory developed in the state caselaw is that when citizens of the state have a beneficial interest in the use of public property there was no taking, but when property was thought to be only locally beneficial, the taking was compen-sable. See Note, The Sovereign’s Duty to Compensate for the Appropriation of Public Property, 67 Colum. L. Rev. 1083, 1095-96 (1967) [hereinafter The Sovereign’s Duty], This concept was often expressed as a distinction between “governmental” and “proprietary” purposes. Id. When a local government was deprived of proprietary property, the taking was com-pensable. Id. But when the property was considered governmental, there was no takings claim. Id.
The difference, as described by Judge Cooley of the Supreme Court of Michigan, is that with respect to
the property [a city] holds for its own private purposes, a city is to be regarded as a constituent in State government, *97 and is entitled to the like protection of its property rights as any natural person who is also a constituent.
People ex rel. Bd. of Detroit Park Comm’rs v. Common Council of Detroit, 28 Mich. 228, 240 (1873). A large body of state caselaw developed dealing with the distinction between local government properties held in governmental capacities and local government properties held in proprietary capacities. See generally 1A Julius L. Saekman, Nichols on Eminent Domain § 2.27, at 2-158 (3d ed. 2009) [hereinafter Nichols] (citing cases); 2 Nichols § 5.06[8], at 5-336. The dichotomous approach often led courts to make difficult factual determinations and to the development in some jurisdictions of a potentially complex classification system, with some types of local government property declared “in” and some declared “out.” The Sovereign’s Duty, 67 Colum. L. Rev. at 1096-97.
Certainly the governmental/proprietary approach has its critics. Justice Frankfurter once characterized the distinction as a “quagmire that has long plagued the law of municipal corporations.” Indian Towing Co. v. United States, 350 U.S. 61, 65, 76 act. 122, 124, 100 L.Ed. 48, 53-54 (1955). Commentators have declared that the cases are “in disarray” and reflect a “mindless application of labels.”. Rudolph V. Parr, State Condemnation of Municipally-Owned Property: The Governmental-Proprietary Distinction, 11 Syracuse L. Rev. 27, 34 (1960); Hugh D. Spitzer, Realigning the Governmental/Proprietary Distinction in Municipal Law, 40 Seattle U. L. Rev. 173, 202-03 (2016).
The difficulties with the distinction have led some- to call for a more functional interpretation of the term “private property” in cases involving municipalities. For instance, in City of Chester v. Commonwealth, the Pennsylvania court, citing federal authority, stated generally that the loss suffered by residents of a political subdivision is no less real that the loss suffered by private individuals as con-demnees. 495 Pa. 382, 434 A.2d 695, 702 (1981). An Oregon appellate case cited the different tax bases of government entities involved in takings litigation, noting that “port districts, are ... distinct from the state. They are supported by a distinct tax base and they serve a distinct constituency.” Brusco Towboat Co. v. State By & Through Straub, 31 Or.App. 491, 570 P.2d 996, 998 (1977) (en banc). Reformers generally call for broadening, rather than restricting, what constitutes private property, with a focus, like the Oregon case, on different tax bases and constituencies. The Sovereign’s Duty, 67 Colum. L. Rev. at 1119 (“The fact of particularized loss should be sufficient to give a right to compensation to a unit of government.”).
Most caselaw, however, continues to adhere to the governmental/proprietary distinction. In these jurisdictions, many have considered whether a waterworks or similar utility involves a governmental or proprietary function. The vast majority of cases indicate that a waterworks involve a proprietary function for takings clause purposes. See 2 Nichols § 5.06[8][b] n.56, at 5-340 (citing cases).
4. Iowa caselaw regarding takings of property held by municipalities. There are only a few Iowa cases touching on the question of whether a municipality has a takings claim under article I, section 18 of the Iowa Constitution. In State ex rel. White v. Barker, we- stated that municipal corporations are entitled to constitutional protections with “respect to private and proprietary rights' and- interests,” and that “[i]t is quite clear that the establishment and control of waterworks for the benefit of the inhabitants of the city” is not a public purpose but is for the city’s private benefit such that we would regard the *98 waterworks as a private corporation. 116 Iowa 96, 106, 89 N.W. 204, 207 (1902). In State ex rel. Pritchard v. Grefe, we held that school property involved in a consolidation did not involve a takings claim. 139 Iowa 18, 30-31, 117 N.W. 13, 18-19 (1908). In Miller Grocery Co. v. City of Des Moines, we stated that the waterworks involved the city acting in its proprietary capacity. 195 Iowa 1310, 1312-13, 192 N.W. 306, 307 (1923). In State ex rel. Board of Railroad Commissioners v. Stanolind Pipe Line Co., we generally endorsed the distinction between governmental and proprietary functions. 216 Iowa 436, 441, 249 N.W. 366, 369 (1933); see also Mid-Am. Pipeline Co. v. Iowa State Commerce Comm’n, 255 Iowa 1304, 1312, 125 N.W.2d 801, 805 (1964) (“[Pjublic property is in some respects and under some conditions protected by the constitutional 'provisions prohibiting the taking of private property without just compensation.”).
5. Discussion. Although the Iowa law is sparse, I conclude that DMWW may bring a takings claim against the drainage district in this case. The approach of Barker, Miller, Stanolind, and Mid-America Pipeline support this conclusion. As we have stated in a nongovernmental takings context, the purpose of just compensation is “designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.” Perkins v. Bd. of Supervisors, 636 N.W.2d 58, 69-70 (Iowa 2001) (quoting Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554, 1561 (1960)). The same principle applies where intergovernmental takings involve a shifting of benefits and burdens to the disadvantage of a local government entity.
Further, even applying a more restrictive government/proprietary approach than is reflected in some of our older caselaw, the operation of a waterworks, consistent with the majority of cases in other jurisdictions, has been considered proprietary in nature. See, e.g., Phillips v. City of Bradenton, 136 Fla. 602, 187 So. 258, 259 (1939); Hicks v. City of Monroe Utils. Comm’n, 237 La. 848, 112 So.2d 635, 642 (1959); State ex rel. Mt. Sinai Hosp. of Cleveland v. Hickey, 137 Ohio St. 474, 30 N.E.2d 802, 804 (1940) (per curiam); Stewart v. City of Cheyenne, 60 Wyo. 497, 154 P.2d 355, 358 (1944).
My approach is consistent with the Nichols treatise on the law of eminent domain. According to Nichols, the operation of a waterworks is a private activity, in which municipal corporations
are mere aggregations of individuals living in the same neighborhood who have banded together to supply themselves with thé necessities and conveniences of life.... In this character, they are clothed with the capacities of a private corporation, and may claim its rights and immunities and are subject to its liabilities.
1A Nichols § 2.27 at 2-159. Thus, “[t]he property acquired by municipal corporations for the private benefit of their inhabitants is protected by the constitution, and can be taken only by eminent domain, and upon payment of its value.” Id. § 2,27, at 2-163.
C. Takings Claim of Government Subdivisions Against Other Government Subdivisions: The Question of Standing. Closely related to the question of whether government property may be considered private for takings purposes is the question of whether government subdivisions may bring takings claims against other state government entities. Some cases stand for the broad proposition that a subdivision cannot bring takings claims against other government entities on the ground that the state itself created govern *99 ment subdivisions and that the state cannot sue itself. Other cases, however, consistent with the governmental/proprietary distinction discussed above, have held that local governments may bring takings claims to prevent unfair shifting of the benefits and burdens of government.
It would be wrong, however, to conclude, as the majority seems to, that public entities can never raise any constitutional questions in litigation -with other state entities. There is certainly a narrow proposition that is comparatively well established, namely, that government subdivisions cannot challenge the constitutionality of statutes under which they operate or under which they were created. Dep’t of Revenue, 263 N.W.2d at 232.
This narrow proposition, to me, is defensible. A county cannot complain that the state prohibited it from engaging in certain activities because the state has the power to shape the configuration of its political subdivisions. I have applied this narrow rule with respect to claims that the legislative action allocating power to drainage districts but failing to include a money-damage remedy violated various provisions of the Iowa Constitution.
But these standing cases only advance a narrow proposition, namely, that government subdivisions cannot challenge the state’s limitations on their own authority. The cases do not stand for a broad, general proposition that government subdivisions can never raise constitutional claims. In my view, government subdivisions can raise takings claims against other governmental subdivisions.
It is true, perhaps, that older caselaw contains sweeping language about the lack of standing of government subdivisions to raise constitutional questions. Specifically, in Hunter v. City of Pittsburgh, the Supreme Court employed language, largely dicta, suggesting that government subdivisions may not raise constitutional issues in disputes against the state. 207 U.S. 161, 179, 28 S.Ct. 40, 46-47, 52 L.Ed. 151, 159 (1907). But the language in Hunter was not unqualified. According to Hunter,
It will be observed that in describing the absolute power of the State over the property of municipal corporations, we have not extended it beyond the property held and used for governmental purposes.. Such corporations are sometimes authorized to hold and do hold property for the same purposes that property is held by private corporations or individuals.

Id.

Later, in Trenton, the Supreme Court declined to apply the governmental/proprietary distinction in a case where a municipality sought to invoke the protections of the Federal Takings Clause against the state. 262 U.S. at 191-92, 43 S.Ct. at 538, 67 L.Ed. at 942-43. The Trenton Court thus held that, irrespective of the nature of the activities of the municipality, the municipality could not invoke constitutional protections against the state. Id.
But the Hunter-Trenton doctrine has fallen into disuse. It has not been employed to bar a local constitutional challenge since 1933. See Nixon v. Mo. Mun. League, 541 U.S. 125, 131, 124 S.Ct. 1555, 1560, 158 L.Ed.2d 291, 299 (2004) (considering merits of municipalities’ Supremacy Clause challenge to a state statute); Romer v. Evans, 517 U.S. 620, 625-26, 116 S.Ct. 1620, 1624, 134 L.Ed.2d 855, 861-62 (1996) (considering various municipalities Federal Equal Protection Clause challenges to state constitutional provisions); Papasan v. Attain, 478 U.S. 265, 274-75, 106 S.Ct. 2932, 2938-39, 92 L.Ed.2d 209, 224-25 (1986) (remanding Equal Protection Clause challenges to state for consideration on merits); Lawrence County v. *100 Lead-Deadwood Sch. Dist. No. 4.0-1, 469 U.S. 256, 257-58, 105 S.Ct. 695, 696, 83 L.Ed.2d 635, 639 (1985) (considering merits of Supremacy Clause challenge, with Hunter cited in dissent); Washington v. Seattle Sch. Dist. No. 1, 458 U.S. 457, 467, 102 S.Ct. 3187, 3193, 73 L.Ed.2d 896, 905 (1982) (considering merits of school district’s Federal Equal Protection Clause challenge to a state statute); San Antonio Indp. Sch. Dist. v. Rodriguez, 411 U.S. 1, 5 n.2, 93 S.Ct. 1278, 1282 n.2, 36 L.Ed.2d 16, 27 n.2 (1973) (accepting school districts intervention in plaintiffs Equal Protection Clause challenge to state’s school finance scheme); Bd. of Educ. v. Allen, 392 U.S. 236, 240, 88 S.Ct. 1923, 1925, 20 L.Ed.2d 1060, 1063-64 (1968) (considering school board challenge to state mandates on expenditures under Establishment Clause); see also Kathleen S. Morris, The Case for Local Constitutional Enforcement, 47 Harv. C.R.-C.L. L. Rev. 1, 3-4 (2012) [hereinafter Morris].
The cases of Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), and Allen, 392 U.S. at 236, 88 S.Ct. at 1923, 20 L.Ed.2d at 1060, illustrate the erosion of Hunter. In Gomillion, Justice Frankfurter limited the scope of Hunter and Trenton to the specific constitutional provisions involved in those cases, namely the Contract Clause, the Due Process Clause, and the Equal Protection Clause of the United States Constitution. 364 U.S. at 344, 81 S.Ct. at 128, 5 L.Ed.2d at 115. According to the Court,
[A] correct reading of the seemingly unconfined dicta of Hunter and kindred cases is not that the State has plenary power to manipulate in every conceivable way, for every conceivable purpose, the affairs of its municipal corporations, but rather that the State’s authority, is unrestrained by the particular prohibitions of the Constitution considered in those cases.
Id. Additionally, the Gomillion Court noted that “[ljegislative control of municipalities ... lies within the scope of relevant limitations imposed by the United States Constitution.” Id. at 344-45, 81 S.Ct. at 129, 5 L.Ed.2d at 115. As noted by one later federal circuit, “Hunter, Trenton, and allied cases are substantive holdings that the [Federal] Constitution does not interfere in states’ internal political organization. They are not decisions about a municipality’s standing to sue its state.” Rogers v. Brochette, 588 F.2d 1057, 1069 (5th Cir. 1979); see also Michael A. Lawrence, Do “Creatures of the State” Have Constitutional Rights?: Standing for Municipality to Assert Procedural Due Process Claims Against the State, 47 Vill. L. Rev. 93, 101 (2002) [hereinafter Lawrence].
Further, the animating principle in Hunter and Trenton is that federal courts should not consider federal constitutional claims brought by government subdivisions against the state. In other words, considerations of federalism played a significant role in denying standing for adjudication of intragovernmental disputes in state court. Hunter and Trenton are not authority on the question of whether a government subdivision may bring state constitutional claims in a state court against the state. See Bd. of Levee Comm’rs of the Orleans Levee Bd. v. Huls, 852 F.2d 140, 143 (5th Cir. 1988) (finding the concept of state suing itself untenable in federal system).
Indeed, we have at least entertained constitutional challenges raised by local governments against state entities in contexts other than challenges to limitations of power. For example, in City of Coral-ville v. Iowa Utilities Board, the city challenged a tariff regime promulgated pursuant to Iowa Code chapter 476 and sought to be enforced by the Iowa Utilities Board. *101 750 N.W.2d 523, 527 (Iowa 2008). The city’s challenge was in part rooted in the uniformity requirements of article I, section 6 and article III, section 30 of the Iowa Constitution, collectively viewed as providing protection similar in scope, import, and purpose to the equal protection provisions of the Fourteenth Amendment to the Federal Constitution. Id. at 530. We considered this challenge on the merits, concluding under the facts and circumstances presented that there was no constitutional infirmity. Id. at 531.
According to one authority, municipal corporations may have standing to assert procedural due process claims against their creating state for the deprivation of certain liberty and property interests that do not involve substantive matters of the state’s internal political organization. See Lawrence, 47 Vill. L. Rev. at 94 n.7; Morris, 47 Harv. C.R.-C.L. L. Rev. at 43-44. This is precisely the situation that arose in City of Coralville, 750 N.W.2d at 526.
In any event, state takings law has traditionally recognized the distinction between proprietary and governmental functions in its state law and allowed municipalities to bring takings claims against other governmental entities. As noted above, Iowa caselaw has long recognized the distinction between proprietary and governmental functions. See, e.g., Stanolind, 216 Iowa at 441, 249 N.W. at 369; Scott County v. Johnson, 209 Iowa 213, 221, 222 N.W. 378, 381 (1928); Miller Grocery, 195 Iowa at 1312, 192 N.W. at 307; Grefe, 139 Iowa at 30-31, 117 N.W. at 18-19; Barker, 116 Iowa at 106, 89 N.W. at 207-08. In these traditional terms, in the context of a taking, a municipal water supplier drawing water from a public water source is acting in a proprietary capacity. DMWW in providing its services is not acting on behalf of the state but as an agent of its local customers. See Morris, 47 Harv. C.R.-C.L. L. Rev. at 7. DMWW should not be regarded as an instrument of the state, but an instrument of the citizens it serves.
Thus, while it may be that a government subdivision cannot challenge matters related to the internal political organization of the state, it can challenge actions of government subdivisions that allegedly run afoul of the specific constitutional command of the takings provision of article I, section 18 of the Iowa Constitution. Therefore, I conclude that DMWW has standing to bring its takings claim under Iowa Constitution, article I, section 18 against the drainage district.
D. Property Interest: Riparian Water Pollution as Taking of “Property.” According to one commentator, one of the most divisive issues in contemporary natural resource law in the United States is whether interests in water are recognized as property. Sandra B. Zellmer & Jessica Harder, Unbundling Property in Water, 59 Ala. L. Rev. 679, 681-82 (2008). Among other things,, how one characterizes the “stick” is critical in the analysis. DMWW does not assert a right to allocation of water, but rather a riparian right of use.
The word “riparian” comes from the Latin word for “bank.” Note, Private Remedies for Water Pollution, 70 Colum. L. Rev. 734, 735 (1970). Riparian rights are restricted to owners of land with a bank fronting upon some point on the watercourse. Id. “Riparian rights do not depend upon ownership, of the watercourse’s bed and do not include ownership of the water itself.” 1 Linda A. Malone, Riparian Rights, Environmental Regulation of Land Use § 8.2, Westlaw LWATRR (database updated Nov. 2016) [hereinafter Malone]. Because of the pollution, according to DMWW, it cannot use the water without expenditure of funds to remove the nitrates.
*102 It may seem a right of use is somewhat intangible and a novel property concept. But easements across land involve a right of use and they have long been recognized as a kind of property interest, and Iowa caselaw supports that proposition. See Bormann v. Bd. of Supervisors, 584 N.W.2d 809, 316 (Iowa 1998); Hosford v. Metcalf, 113 Iowa 240, 244-45, 84 N.W. 1054, 1055-56 (1901) (describing how a license may become an easement on the land which is then a transferable interest in property); see generally Eugene Davis, Water Rights in Iowa, 41 Iowa L. Rev. 216, 220-23 (1956).
And, there are many cases from other jurisdictions that suggest that riparian rights include the right to water of a certain quality. See, e.g., Harrell v. City of Conway, 224 Ark. 100, 271 S.W.2d 924, 926 (1954); Collens v. New Canaan Water Co., 155 Conn. 477, 234 A.2d 825, 831 (1967); Montelious v. Elsea, 161 N.E.2d 675, 678 (Ohio Ct. Com. Pl. 1959); see also Robin Kundis Craig, Defining Riparian Rights as “Property” Through Takings Litigation: Is There a Property Right to Environmental Quality ?, 42 Envtl. L. 115, 145 & n.232 (2012). The leading authorities approve of this approach. See, e.g., 3 Tiffany Real Property § 730, Westlaw (3d ed, database updated 2016) [hereinafter Tiffany] (“The right of the riparian owner ... extends to the quality as well as the quantity of the water.... ”); 1 Malone § 8.2 (“[A] riparian has a right to the natural flow of a watercourse without change in quantity or quality”).
The notion of a riparian right to water quality is embraced in the Restatement (Second) of Torts. Section 850 provides a reasonable use rule, stating “A riparian proprietor is subject to liability for making an unreasonable use of the water of a watercourse or lake that causes harm to another riparian proprietor’s reasonable use of water or his land.” Restatement of the Law (Second) Torts § 850, at 217. Section 850A then provides a number of factors to be considered in determining reasonable use, including,
(a) [t]he purpose of the use,
(b) the suitability of the use to the watercourse or lake,
(c) the economic value of the use,
(d) the social value of the use,
(e) the extent and amount of the harm it causes,
(f) the practicality of avoiding the harm by adjusting the use or method of use of one proprietor or the other,
(g) the practicality of adjusting the quantity of water used by each proprietor,
(h) the protection of existing values of water uses, land, investments and enterprises, and
(i) the justice of requiring the user causing harm to bear the loss.
Id. § 850A, at 220; see generally 1 Malone § 8.2; A. Dan Tarlock, Law of Water Rights and Resources § 3.60, Westlaw (database updated July 2016) (rejecting abstract standards or per se rules in favor of analysis of what uses are in fact protected based on all relevant facts and circumstances).
As is apparent from this test, the law of nuisance and the law of takings overlap substantially. Many of the factors of nuisance are similar to those in the Restatement. The inquiry of whether a nuisance is present and whether a taking requiring just compensation has arisen are determined by a similar, fact-based inquiry.[19]
*103 The relationship between nuisance and takings law is further illustrated in our caselaw. For instance, in Bormann, we held that a nuisance immunity provision in an agricultural land preservation statute was an unconstitutional taking under the United States and Iowa Constitutions. 584 N.W.2d at 321. We came to a similar conclusion in Gacke, where we held that a statutory grant of nuisance immunity amounted to a taking of property that required payment of just compensation. 684 N.W.2d at 175.
How the Restatement (Second) section 850A factors would play out in this litigation, of course, cannot be determined at this stage. Some of the factors may support the drainage district defendants, while others may support DMWW. At this time, the question of whether DMWW has a valid property interest based on its riparian rights cannot be decided as a matter of law, but is a question of fact. See 3 Tiffany § 730 (“[Reasonable use of water ... [is] one of fact.”).
E. State Authorization as Defeating Takings Claim. The majority suggests that because drainage districts advance legitimate state interests, there can be no takings claim. I view this as an incorrect statement of law.
It certainly cannot be denied that drainage districts advance legitimate state interests. But the argument proves too much. For example, a sewage treatment plant advances legitimate state interests, but can it be said categorically that there is no taking if a sewage treatment plant so pollutes waterways that it is no longer safe to inhabit downstream property? See Bowman v. Humphrey, 132 Iowa 234, 236-37, 109 N.W. 714, 715 (1906) (holding that nuisance is still a nuisance even if it comes from a “legitimate enterprise, or one of great and general convenience and benefit”); accord Newton v. City of Grundy Center, 246 Iowa 916, 922, 70 N.W.2d 162, 165 (1955). I note with interest that while some nuisance statutes expressly exempt “conduct done or mandated under a statute,” see, e.g., Cal. Civ. Code § 3482 (West, Westlaw current through 2016 Reg. Sess., ch. 8 of 2015-2016 2d Ex. Sess. and all propositions on the 2016 ballot); Wash. Rev. Code Ann. § 7.48.160 (West, Westlaw current through 2016 Reg. and 1st Special Sess.). Iowa’s nuisance statute does not have such a provision.
Meiners and Yandel, authorities on law and economics, make the aforementioned point by citing the classic case of Carmichael v. City of Texarkana, 94 F. 561 (W.D. Ark. 1899). Roger Meiners & Bruce Yandle, Common Law and the Conceit of Modern Environmental Policy, 7 Geo. Mason L. Rev. 923, 945 (1999). The Carmichaels owned a forty-five-acre farm in Texas located on the border with Arkansas. Id. at 561. The city of Texarkana, Arkansas, built a sewage plant for the city and proceeded to deposit sewage immediately opposite the plaintiffs homestead about eight feet from the state line. Id. at 562. The defendant alleged the sewage plant created a “cesspool” and was “a great nuisance, because it fouls, pollutes, corrupts, contaminates, and poisons the water.” Id. The court noted that the city was operating properly under state law to build the sewer system. Id. at 564. But the lawfulness of the system did not prevent the claim. Id. at 564-66. According to the court,
*104 If a riparian proprietor has a right to enjoy a river so far unpolluted that fish can live in it and cattle drink of it, and the town council of a neighboring borough, professing to act under statutory powers, pour their house drainage and the filth from water-closets into the river in such quantities that the water becomes corrupt and stinks, and fish will no longer live in it, nor cattle drink it, the court will grant an injunction to prevent the continued defilement of the stream....
Id. at 573.
Based on applicable caselaw, I do not think the fact that the legislature has authorized the construction of drainage improvements means that a takings claim cannot be presented when a drainage district allegedly operates its drainage district in violation of the environmental laws in Iowa Code chapter 657 and common law nuisance.
VI. Conclusion.
Based on the above reasoning, I would answer the certified questions as follows.
Question 1: As a matter of Iowa law, does the doctrine of implied immunity of drainage districts as applied in cases such as Fisher v. Dallas County, 369 N.W.2d 426 (Iowa 1985), grant drainage districts unqualified immunity from all of the damage claims set forth in the Complaint (docket no. 2)?
Answer: Yes as to money damages generally. No as to just compensation that might arise from a takings claim.
Question 2: As a matter of Iowa law, does the doctrine of implied immunity grant drainage districts unqualified immunity from equitable remedies and claims, other than mandamus?
Answer: No.
Question 3: As a matter of Iowa law, can the plaintiff assert protections afforded by the Iowa Constitution’s inalienable rights, due process, equal protection, and takings clauses against drainage districts as alleged in the complaint?
Answer: Yes with respect to the takings clause, no with respect to all other clauses.
Question 4: As a matter of Iowa law, does the plaintiff have a property interest that may be the subject of a claim under the Iowa Constitution’s takings clause as alleged in the complaint?
Answer: Possibly, depending on further factual development.
In summary, I would find that DMWW’s lawsuit should be allowed to proceed. Of course, I express no view on the merits of the litigation.
Cady, C.J., joins this concurrence in part and dissent in part.

. Admittedly, though, this notion is clouded by Iowa Employment Security, where the drainage district was required to pay funds to the state to support retirement even though there was no express statutory authority to do so. See 260 Iowa at 346-47, 149 N.W.2d at 291. The power to pay for statutorily required retirement benefits could only have been an implied power. I have, however, rejected the notion of an implied power to pay money damages for torts.

. This provision was declared unconstitutional in Gacke, 684 N.W.2d at 179.

. This assumption, of course, is questionable. Under the Supremacy Clause, the state and federal governments are interconnected because valid exercises of federal executive and legislative power are binding on the states. See U.S. Const, art, VI, cl. 2.

. We have no occasion to opine now whether the test for a taking of a riparian interest in the use of water is the same as a nuisance claim or, as suggested by one commentator, *103 somewhat more demanding. See Carlos A. Ball, The Curious Intersection of Nuisance and Takings Law, 86 B.U. L. Rev. 819, 878-79 (2006). Ball reads our Bormann case as indi-eating that the proof required for nuisance and taking is the same under Iowa law. Id. at 854-56.